STATE V. JOSEPHINE AVERILL.

May Term, 1911.

Present: ROWELL, C. J., WATSON, HASELTON, AND POWERS, JJ.

Opinion filed October 9, 1911.

*Criminal Law—Homicide—Evidence—Previous Threats—Character of Respondent—Competency of Witnesses—Conversions —Cross-Examination—Scope—Murder—Included Offences— Involuntary Manslaughter—New Trial—Surprise.*

An exceptor will be confined in the Supreme Court to the objection that he stated below.

In a prosecution for homicide previous threats by the respondent to kill the deceased are always admissible to show respondent's state of mind, his intent to kill, and his malice against the deceased at the time of the homicide, the remoteness of the threats in point of time goes only to the weight of the evidence, not to its admissibility.

In a prosecution for homicide, evidence of prior threats by respondent to kill deceased was not objectionable as an attack on respondent's character.

The fact that a witness did not hear all of a conversation in which respondent threatened to kill deceased did not make the witness incompetent to testify to the part of the conversation that she did hear.

The rule that in a criminal prosecution, the prosecutor cannot impeach respondent's character until he has adduced evidence to support it refers only to his general character restricted to the trait in issue, and does not have reference to evidence having a legitimate bearing on the guilt of respondent.

Where a witness had fully stated all that respondent said and did on a particular occasion, a question whether respondent then said or did anything that had the appearance of a desire on her part to hide a petticoat was properly excluded, as calling for a conclusion.

Where a question asked a witness consisted of three co-ordinate questions disjunctively connected, and one of those questions was improper, it was not error to exclude the whole question.

Where, for the purpose of showing the tendency of the evidence, the charge of the court and the exceptions thereto, a certified transcript of the whole case and the exhibits are referred to and made a part of the bill of exceptions, but are not made controlling, a question depending on a consideration of the evidence will be determined by the bill of exceptions.

In a prosecution for homicide, where respondent testified on direct exami-
nation concerning her relations with the deceased, and on cross-ex-
amination testified that, when she left a certain place where she had
been working for deceased and a woman, with whom he lived as his
wife, respondent supposed deceased and that woman to be husband
and wife, and that, after respondent had so worked for six weeks that
woman went away, and never returned, respondent was properly
allowed further to be cross-questioned as to why that woman did not
return, and as to whether respondent knew of deceased ever getting
a divorce from that woman.

A general exception to a charge on a designated subject is not available if
any part of the charge on that subject is sound.

Both voluntary and involuntary manslaughter are included in the crime
of murder, and on a plea of not guilty to an indictment charging that
respondent "with force and arms, feloniously, wilfully, deliberately,
with premeditation, and of her malice aforethought, did kill and murder"
the deceased, alleging neither the manner nor the means, he may be
convicted of involuntary manslaughter.

In a prosecution for murder, where respondent's evidence tended to show
that the death of the deceased was caused by the unlawful act of re-
spondent, but without any intention to take life, it was the duty of
the court to instruct the jury as to the law of involuntary manslaughter.

Respondent's exception to the attorney general's argument to the jury in
criticism of the argument of respondent's counsel in his treatment
and characterization of the State's witnesses *held* without force.

Where respondent was indicted and tried for murder in the first degree,
he was bound to know that it was the duty of the court to instruct
the jury on every branch of the case covered by the indictment and
supported by the evidence, and so the fact that the court instructed
as to the law of involuntary manslaughter, which the evidence tended
to show, was not such surprise as would warrant the granting of a new
trial.

INDICTMENT for murder.   Plea, not guilty.   Trial by jury
at the September Term, 1911, Franklin County, *Miles*, J.,
presiding.   Verdict, guilty of manslaughter, and judgment and
sentence thereon.   The respondent excepted.

The respondent was the wife of the deceased.   She admitted
that she shot and killed the deceased, but claimed that it was
accidental.   It appeared that on October 20, 1910, she and the
deceased were living together in their home in the town of St.
Albans.   Respondent testified that in the evening of that day,
after deceased had gone to bed and while respondent was un-
dressing, she asked him whether he supposed that some one

came onto the piazza to scare her on a certain night when deceased was absent; that he answered that he did not know, "why didn't you get a gun and fire it off to scare him;" that she answered that she did not know how to fire the gun; that thereupon he arose saying, "I will show you how to do it," and went into the hall, and was showing her how to fire it when she said, "let me see if I can do that now", and that thereupon he handed her the gun, which was a double barreled shot gun, equipped with a hammer, and loaded; that he then made a noise on the floor, and said, "There's some one now", and went into the bedroom and closed the door; that she was frightened and hit upon the bedroom door with the end of the gun, thereby causing it to fire through the door, and so to wound the deceased that he died the next morning; that respondent's daughter, three years of age, was asleep in the bedroom within a foot of the door, and did not awake till after respondent and deceased had left the house; that after the gun went off, respondent entered the bedroom and said, "My God, Frank, did I shoot you? It was an accident." And he answered, "Yes, Josie, you have shot me, but it was an accident." The State's evidence tended to contradict this story, and to show that the shooting was intentional.

During his argument to the jury, the attorney general, subject to respondent's objection and exception, said: "You know that every witness who has come onto the stand and testified to something that tends to injure the respondent's chances of acquittal of this charge here, has been subject to the most vilifying abuse; you know that almost every person who has taken that chair and undertaken to tell the truth, as he or she knew the truth, if intended to hurt the respondent's chances in the least, has been called perjurer." And after objection and exception, he added, "When I say that, gentlemen, I mean just this, that when counsel for the respondent have commented upon such testimony, they say that what the witnesses say that they saw or heard, or what happened, that in fact it was not true; that is what I mean when I said what I did, and I do not mean anything further than that. You know, gentlemen, that it has been urged to you here that Mr. Frank Wells—that old whiteheaded man did not hear what he said he heard; it

was said that Mr. Frank Wells was the 'prosecutor,' that he is prejudiced against the respondent * * * * Witness the attack made upon the witness, Mrs. Richards. Why? She is testifying falsely it is said, and an argument is made which I propose to dissect when I get to it—argument claiming that she never heard what she says she heard because she was not there. Now, that is not saying she is mistaken; that is not saying she misunderstood; that is not saying she does not correctly repeat what she heard, but it is saying that she is deliberately falsifying." Respondent's counsel had previously said in argument: "But whether deceased made such a statement—that depends on the veracity of Mr. Wells, does it not. * * * * it has a very low value * * * * you are asked on this uncorroborated statement of this man Wells to find this woman guilty of murder * * * * but consider his (Wells) interest in the proposition * * * * his prying into the gun after Averill was taken to the hospital. Wells had become one of the prosecutors in this case and here he is, Johnny on the spot in rebuttal with a story to contradict the respondent, and a story to contradict Mrs. Bird. Yet he says he is not hostile. Gentlemen, consider what you have seen of him in this court room * * * * his testimony is not of sufficient credit to convict this respondent— * * * * story of Wells absolutely false, it must be—or he is entirely mistaken. Can you believe that story of Mrs. Richards? She was not there at all; she denies meeting Mrs. Bird, why do we not know— * * * * her testimony, absolutely unsupported * * * Consider the character and appearance of these witnesses (from Sunapee). Can you put the least reliance upon them or upon their story? Just see Mrs. Hastings's appearance on the stand. We say they are not worth the slightest reliance at your hands."

*M. H. Alexander* and *C. G. Austin & Sons* for the respondent.

It was error to exclude the question, asked the witness Bird, whether at the time respondent put her petticoat into the can, and when the officers were at her house to arrest her, there was any statement or expression by respondent "that

had the appearance of a desire to hide the petticoat." *State* v. *Bradley*, 64 Vt. 470; *Bates* v. *Sharon*, 45 Vt. 474; *State* v. *Ward*, 61 Vt. 153; *Crane* v. *Northfield*, 33 Vt. 124; *Stowe* v. *Bishop*, 58 Vt. 500; *Knight* v. *Smythe*, 57 Vt. 529; *Williams* v. *Norton Bros.* 81 Vt. 1. *Mathewson* v. *Mathewson*, 81 Vt. 173.

The charge of the court that, under the indictment, respondent might be found guilty of manslaughter was error, because it did not conform to the pleadings, and because the indictment did not furnish respondent with a description of involuntary manslaughter. *Snow* v. *Carpenter*, 49 Vt. 426; *Probate Court* v. *Enright*, 79 Vt. 416; *Smith* v. *C. V. Ry. Co.*, 80 Vt. 208; Const. of Vt. Ch. 1, Art. 10; *State* v. *Rowell*, 70 Vt. 405; *Potter* v. *State*, 64 L. R. A. 942; *Johnson* v. *State*, 61 L. R. A. 300; 2 Bish. N. Crim. Pro. §538; *State* v. *Behm*, 72 Iowa 533; *State* v. *Smith*, 66 Mo. 92; *Anderson* v. *State*, 27 Tex. App. 177, 11 Am. St. Rep. 189; *People* v. *Olmstead*, 30 Mich. 431; *U. S.* v. *Holtzhauer*, 40 Fed. 76; *State* v. *Noakes*, 70 Vt. 247; Blashfield Instructions to Juries, §84, p. 192. Evidence of mere negligence in handling a gun is not enough to warrant a charge of involuntary manslaughter. *Robinson* v. *State*, 2 Lea. 239, 31 Am. Rep. 602; *State* v. *Goodley*, 9 Houst. 484, 33 Atl. 226; *Sibeny* v. *State*, 149 Ind. 684, 47 N. E. 458; *Com.* v. *Matthews*, 89 Ky. 287, 12 S. W. 333; *State* v. *Hardie*, 47 Iowa 647, 29 Am. Rep. 496; *Smith* v. *Com.* 93 Ky. 318, 20 S. W. 229; *State* v. *Carleton*, 48 Vt. 636.

*John G. Sargent, Attorney General,* and *George M. Hogan, State's Attorney,* for the State.

It was not error to admit evidence of prior threats by respondent to kill deceased. The fact that the threats were made about two years prior to the shooting alleged goes only to the weight of such evidence, and raises a question of remoteness which addresses itself to the discretion of the trial court, and is not subject to review. *State* v. *Bradley*, 67 Vt. 468; *Smith* v. *C. V. Ry. Co.*, 80 Vt. 208; *Belka* v. *Allen*, 82 Vt. 456; *Perkins & Co.* v. *Perley*, 82 Vt. 523; *State* v. *Nelson*, 89 Am. St. Rep. 691 and note; *State* v. *Porter*, 127 Am. St. Rep. 589. The testimony of the threats, tending to show the quarrelsomeness of the respondent with her husband, at times, was properly

admitted to meet the claim that they had beeen "loving and affectionate from their early acquaintance." *Gotleib* v. *Leach,* 40 Vt. 278; *Lytle* v. *Bond,* 40 Vt. 618; *Perry.* v. *Moore,* 66 Vt. 519; *Stevenson* v. *Gunning,* 64 Vt. 601; *Fuller* v. *Valiquette,* .70 Vt. 502; *Com.* v. *Holmes,* 34 Am. St. Rep. 270; *State* v. *Brooks,* 128 Am. St. Rep. 836.

WATSON, J. The indictment on which respondent was tried contains two counts, each charging her with murder in the first degree, by shooting Frank C. Averill at St. Albans on the 20th day of October, 1910. Verdict, guilty of manslaughter, and judgment thereon.

It appeared that the deceased and the respondent were husband and wife. The State called as a witness one Mrs. Delvina Hastings and offered to show by her that she and her husband lived on a farm at Sunapee, N. H., where the respondent and her husband lived for four or five years, that the witness and her husband were there as tenants from the fall of 1907 about ,a year; that while there she heard the respondent make threats against the life of her husband, hearing her say she would kill him if he did not do certain things. The court asked, "What things?" The state's attorney answered, "That had to do in part with the leasing of the farm and their own private affairs, not all of which she heard; that the respondent is a loud .talking woman; that she frequently became angry with her 'husband and I offer to show also that the witness has seen her ;seize hold of him by the coat collar and yank him around; put ·him in a chair and on the lounge, in connection with threats ;she heard her make; that these threats were in summer of 1908. "

Objection was made to this offer (1)because it is an attack :upon the character of the respondent, which is not in. issue; ;(2) because it does not tend to show her mental condition at ·the time of the alleged killing; (3) "because not the whole of the conversation can be stated, and if the whole might be perhaps a different color or interpretation would be given to what she said;" and (4) because it opens up a collateral issue, and makes it necessary to try each one of these alleged occasions to ascertain whether she had the intent at the times she made the

threats or not.   The State disclaimed any purpose of attacking her character, or of going into collateral matters.

Addressing the state's attorney, the court said, "you offer to show that while she was residing there at a certain time, this witness heard her make a threat to kill her husband."   To which the state's attorney answered, "That is it.   That is all we want to show."   The court, "Then come right to that point." An exception was saved.   Subject to the objection made and the exception taken, all inquiry respecting threats was received. The witness testified that in the summer time of the year of 1908, on the place where they all lived together, she heard the respondent make threats to her husband, Frank C. Averill. The witness was then asked:   "What was the threat, and what did you hear her say?"   The witness answered:   "She said she would kill Frank if he didn't do so and so, when she was angry"—The State objected to the answer, and moved to strike out the "part about being angry".   The court ruled, granting the motion unless the respondent wished to have that part of the answer stand; and no objection being made to striking it out, the motion was granted.

The witness further testified that she heard the respondent make threats twice.   The question was asked, "Did you hear anything else she said at the time she made the threats?"   Here the respondent's attorney objected, saying:   "If they undertake to show the entire conversation, we do not object, but I take it they want to show a part of it and leave out a part, and we object to it."   To which the court replied, "You may call out in cross-examination such of the conversation as took place."

No objection was made, nor exception taken to this course of procedure.   The witness then testified that the threat she heard the respondent make on the second occasion was, "I will kill you Frank, if you don't put them out of the house." Under the same offer, objection, ruling and exception as were made respecting Mrs. Hastings's testimony, her son, also a witness for the State, was permitted to testify that he heard the respondent threaten to shoot her husband in June or July of 1908. But before this evidence was offered and received, the respondent's counsel had called out from the State's witness, evidence

tending to show love and affection on the part of the respondent for her husband, "and that they had been loving and affectionate from their early acquaintance."

It was urged in argument that the threats of the respondent thus shown were conditional, .and that in order to make them admissible in evidence it was incumbent on the State to show that the conditions forming the basis had been complied with. Whether this is so or not we are not called upon to consider, for the objection to the evidence was not put upon this ground. In cases of homicide, previous threats by the accused to kill the deceased are always held admissible to show the state of the mind of the accused, his intent to kill, and his malice against the deceased at the time of the homicide. The remoteness of the threats, in point of time, does not affect their competency. It goes only to the weight of the evidence. *State* v. *Bradley*, 64 Vt. 466, 24 Atl. 1053; 67 Vt. 465, 32 Atl. 238; *Cribbs* v. *State*, 86 Ala. 613, 6 So. 109; *Redd* v. *State*, 68 Ala. 492; *State* v. *Hoyt*, 46 Conn. 330; *Commonwealth* v. *Holmes*, 157 Mass. 233, 34 Am. St. Rep. 270, 32 N. E. 6; *Commonwealth* v. *Goodwin*, 14 Gray 55; *Commonwealth* v. *Quinn*, 150 Mass. 401, 23 N. E. 54; *State* v. *Porter*, 213 Mo. 43, 111 S. W. 529, 127 Am. St. Rep. 589. And since the matter of such threats had such a connection with the issue as allowed them to be given in evidence, no collateral issue was thereby raised. *Comstock's Admr.* v. *Jacobs*, 84 Vt. 281, 78 Atl. 1017. Nor within the meaning of the law, was the evidence, in its declared purpose, an attack upon the respondent's character. The rule that the prosecutor cannot impeach the character of the accused until the latter has adduced evidence to support it, has reference to the general character restricted to the trait which is in issue. It has no reference to evidence otherwise having a legitimate bearing on the guilt of the accused, and thus offered.

The third objection, "because not the whole of the conversation can be stated," had reference to the state's attorney's answer to the court's inquiry, "What things?" The answer, so far as need be particularly noticed in this connection, was, "That had to do in part with the leasing of the farm and their own private affairs, not all of which she heard." It had no reference to the witness not stating in direct examination all

she did hear of the conversation. That question was not raised until, as before seen, near the close of the direct examination of the witness, and then to the ruling (that the respondent's counsel might call out in cross-examination such of the conversation as took place) no exception was taken. The fact that the witness did not hear all the respondent said, does not render her testimony incompetent. *Commonwealth* v. *Pitsinger*, 110 Mass. 101; *Commonwealth* v. *Taylor*, 129 Pa. St. 534, 18 Atl. 558.

Mrs. Lucina Bird, a witness for the State, testified in direct examination, among other things, that after the homicide she was present with the respondent in an outhouse, to which they had gone during the time that the prosecuting officers and the police officers were at the respondent's house to arrest her, the afternoon of October 22; that while there, she saw the respondent remove the petticoat she had worn the night of the shooting, and put it into a can, and cover it with papers, narrating what the respondent said at the time of doing so; and that the witness afterwards pointed out the petticoat to the police officer who produced it in court. In cross-examination the witness was asked, "Was there any statement or expression by her (respondent) or any conduct on her part in connection with that act—the removal of the petticoat and putting it into the can—that had the appearance of a desire to hide the petticoat?" The question was excluded on the ground that it called for a characterization of the act. So far as anything appears, the witness could and did sufficiently detail and describe all that the respondent said and did at the time and place named to enable the jury to form intelligent conclusions from them. The conclusions of the witness called for by the question were therefore properly excluded. *Clifford* v. *Richardson*, 18 Vt. 620; *Cavendish* v. *Troy*, 41 Vt. 99; *Baine* v. *Cushman*, 60 Vt. 343, 15 Atl. 171; *Bishop* v. *Readsboro Chair Mfg. Co.*, 85 Vt.    , 81 Atl. 454. It is urged, however, that the question called for the appearance of the respondent at the time of her arrest, and hence it was proper, even though it called for the judgment or opinion of the witness. An analysis of the question asked shows it really to contain three co-ordinate questions disjunctively connected, only the first of which need be stated. It

amounted to this: Was there any statement by the respondent in connection with the removal of the petticoat, and putting it into the can, that had the appearance of a desire to hide the petticoat? The witness having narrated what the respondent said in that connection, it was the province of the jury to say what those sayings indicated. This element of the question being improper, it was not error to exclude the entire question. *Vaillancourt* v. *Grand Trunk Ry. Co.*, 82 Vt. 416, 74 Atl. 99.

The respondent testified in her own behalf. In cross-examination, her attention being directed to a time previous to any about which she had given testimony in chief, and to an occasion when she left the place in Cambridge, Massachusetts, where she had been working for the deceased and a woman named or called Blanche Averill, she testified that the deceased and Blanche lived as husband and wife, and she then supposed they were married to each other, though she afterwards knew they were not; that after the respondent had been there about six or eight weeks Blanche went away with the understanding that she probably would return before a great while, and the respondent testified that Blanche did not come back there. This was in answer to the question, "How long after that did she (Blanche) and he live together as husband and wife?" The respondent was then asked by the attorney general "Why didn't she come back there?" This question was objected to as not cross-examination. Thereupon the court said to respondent's attorney, "You have been showing their relations and have offered these letters to show their relations. In that view of the case, do you insist this is not cross-examination?" The attorney answered that he did. The question was allowed and exception noted. The respondent answered, "Because there was nobody there, we had gone away." In further cross-examination she was asked, "Then within two days after this time, after the woman you understood to be the man's wife left the house, everything was sold, and you and he had gone to the Boston boarding house to live?" and answered, "Yes." She also testified without objection, on cross-examination, that she and her husband occasionally talked about Blanche, but that she could not remember when this last occurred. Later in

cross-examination she was asked whether she ever knew of his getting a divorce from Blanche. This was objected to as not cross-examination. The court ruled that she might answer "Yes or no," and an exception was saved. She answered, "No." No evidence was offered tending to show that Blanche and the deceased were married, or that the respondent did not know at the time of the conversation about Blanche, that she was not his wife. It appears that the court permitted the questions as proper cross-examination. We take it to be true, as stated by the court when objection was made to the former question, that the respondent had been showing her relations with the deceased, and had offered letters bearing thereon. The fair construction of the bill of exceptions is, that when these questions were asked, the respondent had given testimony in cross-examination without objection tending to show that when she and the deceased left Cambridge together, and went to the Boston boarding house to live, she supposed that he and Blanche were husband and wife, though she afterwards knew they were not. The questions objected to were along the same line—to elicit further testimony bearing upon the respondent's relations with the deceased, and we cannot say from the bill of exceptions that it was not within legitimate cross-examination. Although for the purpose of showing the tendency of the evidence, and the charge of the court, and the exceptions thereto, a certified transcript of the entire case, and the exhibits, are referred to and made a part of the bill of exceptions, they are not made controlling, and the questions are to be determined upon the bill. *Slack* v. *Bragg*, 83 Vt. 404, 76 Atl. 148; *Comstock's Admr.* v. *Jacobs*, cited above.

The exception to the attorney general's argument in criticism of the argument of respondent's counsel in the treatment and characterization of the State's witnesses, and the testimony given by them, is without force. That part of the attorney general's argument to which the exception points, considered in the light of his explanation when the exception was noted, if intemperate at all, was not so to an extent warranting a reversal. Besides, the arguments of respondent's attorneys, as well as that of the attorney general, were addressed to the jury, and if the argument of the latter was unwarranted as now

urged, the jury knew it, and it could do the respondent no harm. *Marshall* v. *Dalton Paper Mills*, 82 Vt. 489, 74 Atl. 108, 24 L. R. A. (N. S.) 128.

The respondent admitted killing the deceased by shooting but denied that it was intentional, and claimed it was purely accidental. The court instructed the jury as to the law of involuntary manslaughter. Respondent's counsel excepted generally to the charge regarding that offence, stating their theory of the prosecution all through the trial had been, that it was a case of a melee in which the shooting was done in the heat of passion, and that at no time did they cross-examine witnesses or put in testimony on the theory of involuntary manslaughter, nor so argue to the jury. "A lawful act done in an unlawful or negligent manner is in law an unlawful act." (*State* v. *Dorsey*, 118 Ind. 167, 20 N. E. 777, 10 Am. St. Rep. 111); and we think the testimony given by the respondent tended to show that the shooting, though unintentionally done, was the result of negligence by her in handling the gun, indicating on her part a carelessness or recklessness incompatible with a proper regard for human life, which if established would in law render her guilty of involuntary manslaughter. It cannot be said that the charge respecting that subject was wholly unsound (see *State* v. *Center*, 35 Vt. 378), and defect in any particular part of it is not reached by such general exception. *Needham* v. *Boston & Maine Railroad*, 82 Vt. 518, 74 Atl. 226. This confines our consideration under that exception to the contention that thus to submit the case to the jury was error, because (respondent says) it did not conform to the indictment which did not furnish her with a description of the charge of involuntary manslaughter.

The question then is, whether a person indicted for murder may be convicted of involuntary manslaughter where the facts justify it, a question, so far as we are aware, never before raised in this State.

At common law, felonious homicide by killing another man was divided into murder and manslaughter. Murder, "When a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and under the King's peace, with malice aforethought either express or implied." Man-

slaughter, "the unlawful killing of another without malice either express or implied; which may be either voluntary, upon sudden heat; or involuntary, but in the commission of some unlawful act." 4 Black. Com. 190-191, 195. In Salisbury's Case, 1 Plow. 101, where John Vane Salisbury was indicted of murder upon malice prepense, the jury found that he killed the man, but not of malice prepense, and so acquitted him of the murder and found him guilty of manslaughter. Whether he should be utterly acquitted by this verdict, or whether the court should give judgment upon him that he should be hanged for the manslaughter, or whether the verdict should serve only against him for an indictment of manslaughter, and be of no other effect, or what else should be done with him, was privately considered and debated by the bench among themselves. The opinion of the whole court was clearly, that they might give judgment upon him to be hanged for the manslaughter. For they held that the jury might give a verdict at large, and find the whole matter; that when he was arraigned for killing a man upon malice prepense, the substance of the matter was, whether he killed him or not, and the malice prepense was but matter of form or the circumstance of killing. And although the malice prepense makes the fact more odious, and for this cause the offender shall lose divers advantages which he should otherwise have, yet it is nothing more than the manner of the fact, and not the substance of the fact, for the substance of the fact is the killing, and when the substance of the fact, and the manner of the fact are put in issue together, if the jurors find the substance and not the manner, judgment shall be given according to the substance.

In Mackalley's case, 9 Co. 65, the indictment was for murder in killing a serjeant of London, and on trial the jury returned a special verdict, submitting to the justices of the court whether thereon the prisoners were guilty of murder or manslaughter. By the King's command all the judges of England were ordered to meet together to resolve what the law was upon the said record; and accordingly all the judges of England, and Barons of the Exchequer, met together and heard counsel upon this special verdict, as well of the prisoners as of the King. Lord Coke says the matter was very well argued by counsel learned

on both sides at two several days, and that divers exceptions were taken to the indictment and to the verdict also. One exception to the verdict was, for that the jurors had not found the special matter contained in the indictment, but other matter, and judgment could not be given against the prisoners upon that indictment. To this it was answered, and in the end resolved, that there was sufficient matter in the verdict pursuant to the matter contained in the indictment upon which the court ought to give judgment of death against the prisoners, notwithstanding the said variance, because the warrant which the serjeant had to arrest the defendant was but circumstance, which it was not necessary to be precisely pursued in evidence, to be found by the jury; that the variance urged was but circumstance, and a variance from the circumstance of the indictment is not material; and "so if one is indicted of the murder of another upon malice prepense, and he is found guilty of manslaughter, he shall have judgment upon his verdict, for the killing is the substance, and the malice prepense the manner of it; and when the matter is found, judgment shall be given thereupon, although the manner is not precisely pursued;" citing Plow. Com. 101.

Thus it was established at common law, that a person indicted for the murder of another upon malice prepense may be found guilty of manslaughter, because it does not differ in kind or nature of the offence, but only in the degree—not in substance of the fact from murder, but only in the ensuing circumstances, a variance as to which does not hurt the verdict. And to this effect is the law stated by Sir Mathew Hale, and by Serjeant Hawkins, in their respective Pleas of the Crown. 1 Hale's P. C. 449, 466; 2 Hawk. P. C. Chap. 47, Sec. 4. See *State* v. *Scott*, 24 Vt. 127.

It is said in *State* v. *McDonnell*, 32 Vt. 491, that the law of manslaughter is very correctly defined by Chief Justice Shaw in the Webster Case, 5 Cush. 295, 52 Am. Dec. 711, thus: "Manslaughter is the unlawful killing of another, without malice, and may be either voluntary, as when the act is committed with a real design and purpose to kill, but through the violence of sudden passion, occasioned by some great provocation, which in tenderness for the frailty of human nature, the law considers sufficient to palliate the offence; or involuntary, when the death

of another is caused by some unlawful act, not accompanied
with any intention to take life." Speaking of the latter branch
of manslaughter, Sir Mathew Hale says: "In these cases, to
speak once for all, the indictment itself must find the special
matter, or in case the indictment be of murder or manslaughter,
and upon the trial it appears to the jury it was involuntary,
(as by misfortune, or in his own defence), the jury ought to find
the special matter, and so conclude, *et sic per infortunium,*
or *se defendendo,* and not generally, that it was *per infortunium,*
*or se defendendo,* because the court must judge upon the special
matter, whether it be murder, homicide, or *per infortunium,*
or *se defendendo,* and the jury is only to find the fact, and leave
the judgment thereupon to the court; and in such case the pris-
oner must not plead the special matter, and so justify but must
plead not guilty, and the special matter must be found by the
jury, * * * for upon the special matter found, the court
may give judgment against the conclusion of the verdict, as
that the fact is manslaughter, tho the conclusion of the verdict
be *per infortunium,* or *se defendendo.*" And by way of illus-
tration his Lordship refers to a case very much in point: "Sir
John Chichester, and his man-servant, whom he very well
loved, were playing together, the man had a bedstaff in his
hand, and Sir John had his rapier in the scabbard, Sir John,
according to the usual sport between them, bids his man guard
his thrust or pass, which he was making at him with his rapier
in the scabbard, the servant with the bedstaff brake the thrust,
but withal struck off the chape of the scabbard, whereby the
end of the rapier came out of the scabbard, but the thrust was
not so effectually broken, but the end of the rapier prickt the
servant in the groin, whereof he died; Sir John Chichester was
for this indicted of murder, and tried at the King's bench bar,
where all this evidence was given; and it was ruled, 1, that
it was not murder, though the act itself was not lawful, because
there was no malice or ill will between them; 2, that it was not
barely chance-medley, or *per infortunium,* because altho the
act which occasioned the death intended no harm, nor could
it have done harm, if the chape had not been stricken off by the
party kild, and tho the parties were in sport, yet the act itself,
the thrusting at his servant, was unlawful, and consequently

the death that ensued thereupon, was manslaughter, and was accordingly found and adjudged, which I heard." 1 Hale's P. C. 471-473.    It is in point to note in passing that excusable homicide, as distinguishable from justifiable homicide, whether *per infortunium* or *se defendendo*, was formerly considered as involving some degree of legal blame or punishment, and so in such cases the verdict, though it excused the death, it did not excuse the forfeiture of goods, nor was the prisoner to be absolutely discharged out of prison, but bailed till the next term or sessions to sue out a pardon and writ of restitution of his goods as a matter of course and right, only paying the expense thereof; that in later times, to prevent this expense in such cases, the judges usually directed a general verdict of acquittal; and still later, by acts of parliament, all practical distinction between excusable and justifiable homicide was wholly done away. 2 Hale's P. C. 477, 478; 4 Steph. Com. 57.

Regarding the form of the verdict Serjeant Hawkins (Vol. 2, C. 47, S. 4.) says: "That it hath been adjudged, that where the jury find a man not guilty of an indictment or appeal of murder, they are not bound to make any inquiry, whether he be guilty of manslaughter, etc.; but that if they will, they may, according to the nature of the evidence, find him guilty of manslaughter or homicide *se defendendo* or *per infortunium;* for the killing is the substance, and the malice but a circumstance, a variance as to which hurts not the verdict.  Yet the books seem to make this difference, that where the jury find the defendant guilty of manslaughter on an indictment of murder, they may give their verdict generally, without setting out any of the circumstances of the fact; but that they shall not be received to find him guilty generally of homicide *se defendendo*, or *per infortunium;* but must set out the whole circumstances of the fact, and in the conclusion show of what crime they find the defendant guilty, wherein, if they be mistaken, it is said that the court may notwithstanding give such judgment as shall appear to be proper from the circumstances of the fact specially set forth."

That both voluntary and involuntary manslaughter are included in the crime of murder, and a person indicted for murder may be convicted of murder or of either species of manslaughter,

as the evidence may warrant, at common law, is held in the following cases in this country: *Conner* v. *Commonwealth,* 13 Bush. 714; *Buckner* v. *Commonwealth,* 14 Bush. 601; *Bush* v. *Commonwealth,* 78 Ky. 268; *Powers* v. *State,* 87 Ind. 144; *Pigg* v. *State,* 145 Ind. 560, 43 N. E. 309; *Watson* v. *State,* 116 Ga. 607, 43 S. E. 32, 21 L. R. A. (N. S.) 1; *Thomas* v. *State,* 121 Ga. 331, 48 S. E. 273; *Gibson* v. *Somers,* 31 Nev. 531, 103 Pac. 1073, 24 L. R. A. (N. S.) 504, 135 Am. St. Rep. 700.

In this State by statute (P. S. 5693), murder is defined and divided into first and second degrees. By section 2268, "In an indictment for murder or manslaughter, the manner in which or the means by which the death of the deceased was caused need not be set forth, but it shall be sufficient in an indictment for murder to charge that the respondent did feloniously, wilfully and of his malice aforethought kill and murder the deceased, and in an indictment for manslaughter to charge that the respondent did feloniously kill and slay the deceased." The first count of the indictment charges that the respondent "with force and arms, feloniously, wilfully, deliberately, with premeditation and of her own malice aforethought, did kill and murder" the deceased, setting forth neither the manner nor the means. This count is in the same form as the indictment challenged by demurrer in *State* v. *Noakes,* 70 Vt. 247, 40 Atl. 249. In that case it was urged that the above provisions of the statute prescribing the form of the indictment were in violation of the Declaration of Rights which declares that in all prosecutions for criminal offences a person has a right to demand the cause and nature of his accusation. It was held that a person charged with murder in the manner prescribed by this statute is fully informed of the cause and nature of the accusation against him; and that there is nothing in the Constitution which precludes the Legislature from dispensing with the necessity of stating the means, manner, and circumstances of the killing, in an indictment for homicide.

If an indictment so drawn sufficiently informs the accused of the cause and nature of the accusation against him for murder, it must follow that it sufficiently informs him of the cause and nature of any offence included within that of murder, for the greater contains the less. Under an English statute (24 and 25

Vict. C. 100, S. 6.)like section 2268 of the Public Statutes, quoted above, it has been held that in an indictment for manslaughter it is not necessary to go into detail as to the duty by neglect whereof the death was caused, yet if it is set out, it must be so set out as to show a legal duty. *Queen* v. *Clerk of Assize of Oxford Circuit*, (1897), 1 Q. B. 370; 8 Ency. Laws of Eng. 567.

By P. S. 2337, "under an indictment for murder the respondent may be convicted of murder in the first degree, murder in the second degree, or of manslaughter, as the case may be upon the proofs." And in section 5697, the statute is specific that if in the opinion, of the jury, the evidence is not sufficient to convict of murder a person arraigned and put on trial for that offence, it may convict him of manslaughter, if in its opinion the evidence is sufficient to prove that offence. Manslaughter, like murder, is a felony in this State. It is not defined by statute, nor are voluntary and involuntary manslaughter thus recognized as distinct crimes. The Legislature specifies manslaughter, but leaves the definition or description of that offence to the common law, by which, as before noticed, it may be either voluntary or involuntary, according to the circumstances under which the unlawful act causing death was done. We think it clear that the sections of the statute prescribing the form of the indictment for murder and manslaughter, and of the verdict which may be rendered where the accused has been arraigned and put on trial for murder, are not in restriction of the common law in this respect, and that the crime of manslaughter named in these sections includes, as at common law, both species, voluntary and involuntary. It follows that since the respondent's evidence tended to show that the death of the deceased was caused by the unlawful act of the respondent, not accompanied with any intention to take life, it was the duty of the court to give instructions to the jury to meet that view of the case, and a failure so to do would have been prejudicial error. This was expressly held in *Bush* v. *Commonwealth*, 78 Ky. 268, and in *Spriggs* v. *Commonwealth*, 113 Ky. 724, 68 S. W. 1087.

The petition for a new trial is based upon the ground that the respondent was surprised by the court's giving any charge upon involuntary manslaughter, and she did not have an opportunity to meet that charge. But this petition is without

merit.   The respondent was bound to   know that it was the duty of the court to charge upon every branch of the case within the indictment and supported by evidence.   As held upon the exceptions, this included the involuntary branch of manslaughter. In these circumstances the submission of the case to the jury in a manner to include that offence affords no ground for surprise, and if she was surprised thereby it was due to her own fault and not to any act of the prosecution or of the court.   Moreover, since this view of the case rested largely if not wholly upon testimony given by the respondent herself in direct examination, there does not seem to be much force in her position that she did not have an opportunity to meet it.

*Judgment that there was no error in the proceedings of the county court, and that the respondent take nothing by her exceptions. Petition for a new trial dismissed with costs.*