## State of Vermont v. Robert D. Goshea

[398 A.2d 289]

No. 153-78

Present: **Barney, C.J., Daley, Larrow, Billings and Hill, JJ.**

Opinion Filed February 6, 1979

M. *Jerome Diamond,* Attorney General, and *Richard A. Unger,* Assistant Attorney General, Montpelier, *John S. Liccardi,* Rutland County State's Attorney, Rutland, and *William T. Keefe,* Williston, for Plaintiff.

*James L. Morse,* Defender General, Montpelier, *Welch and Graham,* White River Junction, and *Barry E. Griffith,* Rutland County Public Defender, Rutland, for Defendant.

**Hill, J.** This appeal is from a conviction of murder in the first degree. The defendant was tried by a jury and sentenced to life in prison. Following the verdict, motions for judgment of acquittal (not pursued here) and a new trial were denied. Three months after the verdict and prior to sentencing, the defendant filed a second motion for a new trial. This motion, unlike the first, was based on the ground of newly discovered evidence. As amended, it alleged that the State's Attorney had withheld evidence tending to negate the guilt of the accused. The trial court denied the motion. We reverse.

At 11:30 p.m. on July 3, 1971, the burning body of a homicide victim was discovered under the Killington Ski Area gondola where it crosses Roaring Brook Road East in Sherburne, Vermont. The police investigation did not focus on the appellant until mid-1974. In May of that year, his onetime paramour repudiated earlier statements and implicated him in the crime. As a result of her new statement, a grand jury indictment issued. It alleged that the murder victim was one Ronald Rodgers, a longtime friend of the defendant.

The trial began on November 28, 1977. Ronald Rodgers' uncle positively identified the body as being Rodgers. He also made a positive identification of the body the night it was discovered. For this reason, the procedures normally used to identify a disfigured corpse, *e.g.,* verifying dental records or fingerprints, were not employed. In testifying that the corpse was Rodgers, the uncle relied on the presence of scars on the body's wrists and upper lip,

the location and wording of a unique tattoo on the right forearm, the particular musculature and facial features of the body, a prominent Adam's apple, fatty tumors on his arms, and the particular clothing on the body. This clothing included a shirt with shotgun blasts through the name "Ron Rodgers," indicating that the victim was wearing the shirt when he was shot. The defendant's former paramour testified that he confessed to her that he had killed Ronald Rodgers in Sherburne the evening the body was discovered and then set it afire. A charred checkbook containing blank checks on the account of "Ronald Rodgers" was found on the victim. Other corroborating evidence of lesser magnitude also was introduced.

The defendant's theory of the case was that the murder victim was not Rodgers, but rather a Rodgers look-alike murdered by Rodgers to cover up his planned disappearance to avoid an upcoming robbery prosecution. The Chief Medical Examiner for the State of Vermont, who performed an autopsy on the body, testified that he did not find the scars referred to by Rodgers' uncle. He also testified that due to the fire, the tattoo referred to by the uncle was indecipherable and that the other physical features relied on by the uncle were distorted.

The parties stipulated that Ronald Rodgers had his spleen removed in routine fashion in 1961. The Medical Examiner testified that the corpse he examined had a spleen. He also testified that in his opinion the spleen he removed from the corpse was a primary not an auxiliary spleen. This was based in part on the fact that the murder victim's spleen weighed 120 grams, while the largest auxiliary spleen he had seen discussed in the medical literature weighed 70 to 80 grams. The doctor indicated that an auxiliary spleen would be egg shaped and that the victim's spleen was not. Further, the victim's spleen was found in the normal splenic bed where a primary spleen would be located.

He also testified that the victim's digestive tract contained beef or some other mammalian meat. The defendant produced evidence that Ronald Rodgers consumed a turkey sandwich shortly before the corpse was located in Sherburne. According to the Medical Examiner, the red blood cells of chicken or turkey contain nuclei while mammals' red blood cells do not. The autopsy failed to locate any substance in the victim's digestive tract that contained nucleated red blood cells.

One witness, Rodgers' cousin, testified that Rodgers had told her that if he ever needed to disappear he would kill his look-alike, take the body up to Killington, and set it afire. She then testified that the defendant, on another occasion, also described such a murder to her as the way to commit a perfect crime.

This was the state of the evidence on the identity of the homicide victim when the trial court ruled on the defendant's second motion for a new trial. The motion alleged that in the midst of the trial a person contacted the Rutland County State's Attorney's Office to report that on that day he had seen a man in Burlington, Vermont, who appeared to be Ronald Rodgers. It also alleged that the witness personally was familiar with Rodgers, that this information was communicated to the State's Attorney during the trial, and that he failed to inform either the court or defense counsel. (The information came to the attention of defense counsel several weeks after the trial from members of the Rodgers family.) The motion further stated that during closing argument and in order to convince the jury that the corpse was that of Ronald Rodgers, the prosecution stressed that there was no evidence that Ronald Rodgers had been seen since the day the murder victim was discovered. It requested that a new trial be granted on three alternative grounds. First, because the withheld evidence would be likely to bring about an acquittal on retrial. See *State* v. *Jackson*, 126 Vt. 250, 227 A.2d 280 (1967). Second, because the defendant was prejudiced by a violation of V.R.Cr.P. 16(b)(2) and 16.2(b). Cf. *State* v. *Cheney*, 135 Vt. 513, 380 A.2d 93 (1977); *State* v. *Evans*, 134 Vt. 189, 353 A.2d 363 (1976) (review of violations of V.R.Cr.P. 16(a)). And third, because the prosecution, by withholding the evidence and then arguing its nonexistence to the jury, denied the defendant due process of law by violating his right to a fair trial under the Fourteenth Amendment to the United States Constitution and Article Tenth of the Vermont Constitution.

The motion was supported by the witness' affidavit, and it was followed by a letter from the State's Attorney acknowledging that he had received the information as alleged on December 2, 1977, the fifth day of an eight day trial.

The hearing on the motion was held on March 21 and April 19, 1978. The testimony of the absent witness and the arguments of counsel were received. The witness involved is a longtime resident of Rutland, Vermont, a seventeen year employee of the New

England Telephone Company (now employed in a supervisory capacity), and a member of the Rutland Town School Board. He testified that he had been acquainted with Ronald Rodgers for most of his life and had worked with him at the Pico Peak Ski Area during the winter of 1967–68. He said that during the trial he was in Burlington and met a person face to face on the stairway in Woolworth's Department Store that looked like Ronald Rodgers. He did not speak to this man but he believed it to be Rodgers because he "saw how intense his eyes were—his eyes and a thin nose. And there's something about his eyes, you know, you just remember him. When you see somebody like that, that's really striking. He was a very intense looking person." The witness confirmed that he contacted the State's Attorney's office and left his name, phone number, and the message that he "had seen somebody that strongly resembled Rodgers and possibly somebody might want to look into it." On cross-examination the witness admitted that he had not seen Rodgers since 1971.

The trial court found that the testimony of the witness was newly discovered by the defendant and material, but the court also found that it would not be likely to bring about acquittal on retrial, citing *State* v. *Jackson, supra*, because the witness knew Rodgers only casually and had not seen him in years. Furthermore, he experienced only a brief glimpse of the person in Woolworth's and recognized only two features similar to Rodgers', the eyes and nose.

The court also found that the prosecution, by failing to furnish the defendant with the information it received from the witness, violated V.R.Cr.P. 16(b)(2) and 16.2(b). Those rules impose a continuing duty on the State to disclose all exculpatory evidence to the defendant in a criminal case. Because of the violation, the court held that the motion for new trial should be evaluated under a less stringent standard than normally would apply under *State* v. *Jackson, supra*. It determined that the motion should be evaluated under the standard set out in *United States* v. *Agurs*, 427 U.S. 97, 112 (1976), which it found to be: "whether 'the omitted evidence creates a reasonable doubt that did not otherwise exist,'" evaluating the omission "'in the context of the entire record.'"

The court found the identity of the homicide victim "to be one of the most closely contested issues" at the trial, "an issue that the

jury could have decided either way." But "conceding the closeness of the issue and the possibility that the 12 finders of fact could have entertained reasonable doubts on the identity issue, the Court [found] it impossible to believe that the extremely weak and inherently unreliable (although sincere) testimony of [the witness] would have created a reasonable doubt in the minds of the jurors that did not already exist."

The court then concluded that no grounds separate from the due process considerations discussed in the *Agurs* opinion required setting aside the verdict or applying other less severe sanctions as a deterrent to prosecutorial misconduct. It noted that the incident occurred in the course of a busy trial, did not involve willfulness or bad faith, and could have been considered a crank call arising from the publicity over the identity issue.

In our judgment, the trial court erred when it concluded that due process considerations separate from those discussed in *Agurs* do not require setting aside the verdict and granting the defendant a new trial.

In *Agurs* the Supreme Court clarified the due process considerations underlying *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny. In *Brady* the Court held that the suppression by the prosecution of evidence favorable to an accused may violate due process, irrespective of the good faith or bad faith of the prosecution. The *Agurs* Court stated that the rule of *Brady* "arguably applies in three quite different situations." 427 U.S. at 103. The first is where the prosecution knew, or should have known, that its case included perjured testimony. The second situation, typified by *Brady*, is where the evidence was suppressed despite a specific pretrial request for it. The third situation is where no discovery request, or only a request for "anything exculpatory," is made.

The *Agurs* opinion deals with this last situation. The Court held that the strict standards governing motions for a new trial based on one of the first two situations should not apply to the third, because a request for "anything exculpatory" really gives the prosecutor no better notice than if no request is made. *Id.* at 106–07. Whether a request is made or not, in the third situation the prosecutor's constitutional duty to disclose the evidence remains the same. *Id.* at 107. And whether this duty has been

violated depends on the character of the evidence and not the character of the prosecutor. *Id.* at 110. The Court then proceeded to determine what standard of materiality gives rise to a duty to disclose evidence in the third situation. It held that because "such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal," the standard generally applied by lower federal courts evaluating motions for a new trial based on newly discovered evidence. *Id.* at 111. If that standard were applied, "there would be no special significance to the prosecutor's obligation to serve the cause of justice." *Id.* The Court therefore concluded that "[t]he proper standard of materiality must reflect [an] overriding concern with the justice of the finding of guilt." *Id.* at 112.

> Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* at 112–13.

■ The trial court erred in its application of *Agurs* to the instant case. It is true that in *Agurs* the Court held that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Id.* at 110. But there the Court was concerned with the "moral culpability, or the willfulness, of the prosecutor," *id.*, in suppressing the evidence, reaffirming the holding in *Brady* "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution.*" *Id.* n.17 (quoting *Brady*

v. *Maryland, supra,* 373 U.S. at 87). It earlier made clear, however, that it was not dealing with a case involving prosecutorial misconduct. *Id.* at 104. The conduct of the prosecutor at the trial is always relevant to the question whether the accused's right to due process has been violated, for a prosecutor is the servant of the law and has a constitutional as well as an ethical responsibility to respect the accused's right to a fair trial. When a state's attorney abrogates that responsibility, every person suffers a loss of freedom.

 The evidence in question is favorable to the accused, and it is relevant to an element of the State's case that the trial court found subject to doubt. The prosecutor not only withheld it, he took advantage of its absence from the record by arguing its nonexistence to the jury. In discussing the defendant's look-alike theory, the prosecutor said to the jury:

> I submit to you, ladies and gentlemen, that is ridiculous. [After committing the crime, Rodgers] would have had to vanish. *He would have had to leave the State of Vermont somehow, having been seen by no one and never be seen again.*

Such a tactic is unfair and pernicious. The argument to the jury stands as an open admission by the prosecutor of the exculpatory character of the evidence. In making it, he exceeded the bounds of advocacy. As the Court recognized in *Brady,* the purpose of overturning a conviction obtained in a trial involving prosecutorial misconduct "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." 373 U.S. at 87. See *State* v. *Parker,* 104 Vt. 494, 162 A. 696 (1932).

The State argues in its brief that the suppressed evidence was cumulative and that we therefore should uphold the trial court's denial of the defendant's motion. This evidence is not cumulative. See *State* v. *Jackson, supra.* It is the only evidence that someone believes that they saw the alleged murder victim after the crime was committed. It is independent evidence that tends to support the defendant's theory of the case, and the prosecutor should have brought it to his attention.

The motion for a new trial made the defendant's position clear. He argued that by suppressing the evidence and then stressing its nonexistence to the jury the prosecutor deprived him of a fair trial as guaranteed by the Fourteenth Amendment to the United

States Constitution and Article Tenth of the Vermont Constitution. We agree.

Since no question is raised as to the sufficiency of the evidence to go to the jury, we reverse and remand.

*Reversed and remanded.*