# State of Vermont v. Wayne E. Delisle

[648 A.2d 632]

No. 92-039

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed July 1, 1994

294

296

*Jeffrey L. Amestoy*, Attorney General, and *Susan R. Harritt*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Peter F. Langrock* and *Mitchell L. Pearl* of *Langrock Sperry & Wool*, Middlebury, for Defendant-Appellant.

**Morse, J.** Defendant appeals a jury conviction of second-degree murder. The principal issue is how the jury should be instructed when a lesser-included offense supported by the evidence is barred by the statute of limitations. We conclude that, in such a situation, the defendant should have a choice between foregoing an instruction on the lesser offense or obtaining an instruction informing the jury that, because the passage of time precludes prosecution for the lesser offense, it must acquit the defendant if it determines the evidence would support a conviction for that offense alone. Because the court refused defendant's alternative request to give a similar instruction, we reverse and remand for a new trial.

## I.

On November 4, 1976, Richard Gonyo reported to the Vermont State Police that his wife, Laurie, was missing. Her body was found eight months later in the Lamoille River, wrapped in a tarp, bound with rope, and weighted down by cement blocks. Although the police considered defendant a suspect, no charges were brought against him at that time, and the case was classified as unsolved. In late 1989 or early 1990, defendant's son, Wayne "Bud" Delisle, who was eleven years old in 1976, went to the police with evidence implicating his father in Laurie Gonyo's murder. On March 7, 1990, the State charged defendant with first-degree murder.

At trial, the State presented evidence that the items used to wrap, bind, and weigh down the victim's body were indistinguishable from

similar items gathered from defendant's property, which adjoined the victim's property. The state pathologist testified that the cause of death was manual strangulation. The State also introduced evidence that defendant and the victim had quarreled the night before she disappeared. Bud testified that the victim threatened to tell "a dark tale" about defendant if he did not take her horses to be shod the next day and did not give her new horse blankets. Bud also testified that during this argument defendant threatened to kill the victim. Bud then testified as to defendant's activities on the morning of the day the victim disappeared, explaining that his father broke with his normal routine. Bud testified that his father went toward the Gonyo residence, returned shortly thereafter, threw a tarp and some other items into the back of a pickup truck, and drove off. The State also presented evidence that defendant fled the area after the victim disappeared and introduced arguably inculpatory statements made by defendant. It was also undisputed that defendant and the victim had been involved in what the State described to the jury as "a torrid love affair."

Defendant maintained that he was innocent and that somebody else had killed Laurie Gonyo. He offered the alibi that he was at work in a store owned by his parents, which they corroborated. Defendant also explained that he left the area because the victim's husband threatened him, not because of the victim's disappearance.

The court instructed the jury on first-degree murder and the lesser-included offense of second-degree murder, but not voluntary manslaughter. Instead, the court instructed the jury that if the State failed to prove all of the elements of murder in the first or second degree, the jury must acquit defendant even if the State proved beyond a reasonable doubt that he had killed the victim. The jury convicted defendant of second-degree murder, and the court sentenced him to twenty-to-fifty years in prison.

Defendant claims on appeal that: (1) the trial court had accepted and was bound by a plea agreement to voluntary manslaughter, and even if the trial court was not bound by the plea agreement, it abused its discretion in rejecting the plea; (2) the trial court erred in refusing to charge the jury on the lesser-included offense of manslaughter; (3) the State did not present sufficient mens rea evidence for a second-degree murder conviction; (4) the court erred in allowing the State to give evidence concerning tangible evidence that it had lost; and (5) due process requires reversal because of the age of the case and inability to defend. Defendant raises other issues that we need not reach in light of our disposition of this case.

## II.

Defendant first argues that the trial court accepted, and thus was bound by, the terms of a plea agreement reached by the parties. He also contends that, even if the court was not bound by the parties' agreement, it abused its discretion in rejecting the agreement.

On October 15, 1990, the parties informed the court that defendant agreed to plead no contest to the charge of manslaughter, and, in return, the State agreed to recommend a sentence of not less than four nor more than ten years, all suspended except for two years to serve, minus credit for time already served. During its colloquy with defendant to assure that the plea was knowing and voluntary, the court informed defendant that he would be given the sentence he agreed to "assuming that I'm able to consummate the plea agreement for you." The court also informed defendant that he could withdraw the plea "right through these proceedings." After hearing a rendition of the facts of the case, the court asked the State why it decided to enter into the plea agreement. The State explained that it was a "tactical decision" motivated primarily by the age of the case, but it conceded that the victim's mother was frustrated by the proposed sentence. The court responded as follows: "Okay. I'm going to be ordering a presentence report. I think it's important in this case." The court then entered an adjudication of guilt and stated that it would set a sentencing hearing after it had a chance to review the report.

Before the sentencing hearing, the court advised counsel in chambers that it had serious reservations about accepting the plea agreement. Both parties filed memoranda in support of the agreement, and then argued for the agreement at a February 28, 1991 hearing. While conceding that it had not specifically informed defendant at the October 15, 1990 hearing that it was deferring a decision on whether to accept or reject the plea agreement, the court stated that "that is the fairest interpretation of what occurred at that time." Noting that it had ordered the presentence report "to give me the advantage of having the probation officer's input and to reflect myself at greater length on what an appropriate sentence would be," the court concluded that it did not "believe that the plea agreement calls for an appropriate sentence given the nature of this offense."

Defendant contends that, in failing explicitly to defer its decision on whether to accept or reject the agreement at the October 15, 1990 hearing, the court accepted the agreement and was bound by it. In support of its contention, the defendant cites federal case law, particularly *United States v. Holman*, 728 F.2d 809, 812 (6th Cir.),

*cert. denied,* 469 U.S. 983 (1984), for the proposition that a court's failure explicitly to reject, or defer a decision on, a plea agreement amounts to an acceptance of the agreement. The State counters that the court was not bound by the agreement because, unlike Federal Rule of Criminal Procedure 11(e)(2), Vermont Rule 11(e)(2)–(3) explicitly provides that a plea agreement neither binds the court nor limits its imposition of judgment or sentence unless the court informs the defendant that the maximum judgment and sentence it will impose is the one provided for in the agreement. We conclude the court was not bound by the agreement.

Once the prosecuting attorney has disclosed the terms and reasons for a plea agreement, Vermont Rule of Criminal Procedure 11(e)(2)–(4) sets forth the following procedure:

(2) *Notice of Such Agreement.* . . . . Thereupon the court, before entry of the plea, may accept or reject the agreement, or defer its decision as to acceptance or rejection until there has been an opportunity to consider the presentence report. The plea agreement shall not be binding upon the court nor shall it limit the court in the judgment and sentence to be imposed unless the court accepts the plea agreement under subdivision (e)(3) of this rule.

(3) *Acceptance of Plea Agreement.* If the court accepts the plea agreement, the court shall inform the defendant that it will embody in the judgment and sentence the disposition provided for in the plea agreement or a less onerous disposition.

(4) *Rejection of Plea Agreement.* If the court rejects the plea agreement or defers decision upon it, the court shall inform the parties of this fact, advise the defendant personally in open court that the court is or may not be bound by the plea agreement, pursuant to Rule 32(d) afford a defendant who has already pleaded the opportunity to then withdraw his plea, and advise the defendant that if he persists in his plea the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement.

Our reading of the transcript of the plea hearing leads us to conclude that the court intended to defer a final decision on whether to accept or reject the plea agreement until it had an opportunity to review the presentence report. Further, because the Vermont rule states that the court is not bound by a plea agreement unless it informs the defendant that the strictest judgment and sentence it will

impose is the one provided in the agreement, see V.R.Cr.P. 11(e)(2), (3), we reject defendant's argument that an acceptance must be presumed unless the court explicitly rejects the agreement or defers its decision. We recognize that the court did not defer its decision in the exact terms provided in subsection 11(e)(4), but the court suggested that it had not yet decided whether to accept the agreement, and it informed defendant that he could still withdraw his plea. While we encourage the courts to follow subsection 11(e)(4) to the letter, we cannot conclude in this instance that the court accepted the agreement. Cf. *State v. Whitney*, 156 Vt. 301, 302, 591 A.2d 388, 389 (1991) (while it is "better practice" for court, when deciding whether to accept guilty plea, to explain to defendant elements of offense and factual allegations comprising offense, V.R.Cr.P. 11(f) "is not a per se rule").

■ Defendant argues, however, that even if the court was not bound by the plea agreement, it abused its discretion by not accepting the agreement. We find no abuse of discretion. The court determined that, despite the long delay in bringing the prosecution, the relatively light sentence proposed was inappropriate given the nature of the crime. This was a sufficient reason for the court to reject the agreement. See *United States v. Miller*, 722 F.2d 562, 563 (9th Cir. 1983) ("Rule 11 also contemplates the rejection of a negotiated plea when the district court believes that the bargain is too lenient, or otherwise not in the public interest."). Further, the record does not support defendant's contention that the court capitulated to public pressure.

## III.

Next, we address defendant's challenge to the trial court's refusal to charge the jury on manslaughter. Defendant requested a jury instruction on manslaughter as well as first- and second-degree murder. The requested charge would have allowed the jury to find defendant guilty of manslaughter, even though the three-year statute of limitations had run on that offense. See 13 V.S.A. § 4501. In the alternative, defendant requested that the court charge the jurors on the definition of manslaughter, and then instruct them to acquit if they found that he had committed that offense only. The trial court indicated that it would not instruct the jury on manslaughter unless defendant waived the statute of limitations on a manslaughter prosecution. Defendant refused to waive the limitations bar, and the court charged the jury on first- and second-degree murder only.

Defendant argues that the trial court erred by requiring him to waive the statute of limitations as a condition of having the jury instructed on a lesser-included offense. He contends that the statute-of-limitations bar does not conflict with his right to have lesser-included offenses charged. Rather, defendant maintains, if the jury were instructed on manslaughter and returned a guilty verdict on that charge, then the statute of limitations would operate to prevent the court from entering judgment on the verdict. Thus, defendant argues, the jury charge was not sufficient and his conviction must be reversed. On the other hand, the State argues that if a defendant is not required to elect between the two rights, then the defendant can "have his cake and eat it, too" by receiving the lesser-included-offense instruction and then avoiding punishment if convicted on that offense only.

█ As a general rule, a criminal defendant is entitled to have the jury instructed on all lesser-included offenses. *State v. Bolio,* 159 Vt. 250, 252, 617 A.2d 885, 886 (1992); see Reporter's Notes, V.R.Cr.P. 31(c). Murder in the second degree and manslaughter are lesser-included offenses of first-degree murder. See 13 V.S.A. § 2310 (second-degree murder); *State v. Averill,* 85 Vt. 115, 132, 81 A. 461, 467 (1911) (manslaughter). A requested charge on a lesser-included offense will be given, however, only if the facts in evidence reasonably support such an instruction. *State v. Wright,* 154 Vt. 512, 518, 581 A.2d 720, 724–25 (1989), *cert. denied,* 498 U.S. 1032 (1991).

Citing *Wright,* the State argues that the trial judge did not err in refusing to instruct the jury on voluntary manslaughter because the evidence did not support such an instruction. The State reasons that because defendant contended that he was not involved in the victim's death or the concealment of her body, there was no evidence to support a jury determination that defendant acted with sudden passion, under great provocation, or diminished capacity—the mitigating factors supporting manslaughter.

█ We are reluctant to conclude that the evidence did not support an instruction on manslaughter. "[V]oluntary manslaughter is an intentional killing committed under extenuating circumstances that would mitigate, but not justify, the killing, such as provocation that would cause a reasonable person to lose self control." *State v. Johnson,* 158 Vt. 508, 518 n.4, 615 A.2d 132, 138 n.4 (1992). The evidence showed that the victim and defendant were in a deteriorating love affair and the victim had threatened defendant that she had

"a dark tale" to tell. In addition, the manner of death was manual strangulation. These facts could conceivably have led the jury to conclude that this was an unlawful killing committed in the heat of passion. Indeed, even the State, while arguing in support of the rejected plea agreement, conceded that this "could have been a crime of passion," and the trial court acknowledged that an instruction on manslaughter would have been appropriate if the statute of limitations had not run on that offense.

We must address, then, the issue of how to instruct the jury when defendant seeks an instruction on a time-barred, lesser-included offense that is supported by the evidence. In *Spaziano v. Florida*, 468 U.S. 447 (1984), the United States Supreme Court considered this dilemma. In that case, as in this one, the trial court had agreed to instruct the jury on lesser-included offenses only if defendant waived the limitations bar. The defendant refused to do so, the court instructed the jury on capital murder only, and the jury convicted the defendant. The Supreme Court affirmed the conviction, holding that a defendant is not constitutionally entitled to a lesser-included offense instruction when prosecution for that offense is barred by the statute of limitations; instead, the defendant may choose to waive the limitations bar and obtain the requested instruction. *Id.* at 456.

In so holding, the Supreme Court was required to harmonize its decision with *Beck v. Alabama*, 447 U.S. 625 (1980), which "made clear that in a capital trial, a lesser included offense instruction is a necessary element of a constitutionally fair trial." *Spaziano*, 468 U.S. at 455. The Court distinguished *Beck*, explaining that

> [t]he element . . . in *Beck* found essential to a fair trial was not simply a lesser included offense instruction in the abstract, but the enhanced rationality and reliability the existence of the instruction introduced into the jury's deliberations. *Where no lesser included offense exists*, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process.

*Id.* (emphasis added). The Court reasoned that requiring the lesser-included-offense instruction after the statute of limitations had run "would simply introduce another type of distortion into the factfinding process" by tricking the jury "into believing that it has a choice of crimes for which to find the defendant guilty, [when] in reality there is no choice." *Id.* at 456. According to the Court, such a rule would undermine the public's confidence in the criminal justice

system and would do serious disservice to the goal of rationality stated in *Beck. Id.* The Court concluded that the "better option" was to give the defendant a choice between either asserting the statute of limitations and not receiving an instruction on the lesser-included offense or waiving the statute of limitations and receiving an instruction on the lesser-included offense. *Id.*

■ We share the *Spaziano* Court's concern that instructing juries on time-barred, lesser-included offenses is misleading and would undermine the public's confidence in the integrity of the criminal justice system. We recognize that this Court has held that a jury does not have a right to consider the question of punishment in its deliberations because "knowledge concerning punishment could not aid a jury in determining whether or not a defendant was guilty of the offense charged," and that "the disposition after verdict is for the court, and is not to be charged to the jury." *State v. Smith*, 136 Vt. 520, 526, 396 A.2d 126, 129 (1978) (trial court should not inform jury of defendant's institutional disposition if it found him not guilty by reason of insanity); see *State v. Goyet*, 120 Vt. 12, 52–53, 132 A.2d 623, 649 (1957) (no error in refusing to charge jury on punishment that would result from convictions for different degrees of murder); *State v. Lapan*, 101 Vt. 124, 142–43, 141 A. 686, 695 (1928) (no error in court's refusal to comply with jury's request that it be informed as to maximum penalty for manslaughter). But it is one thing to withhold from the jury unnecessary information, and quite another to mislead jurors by instructing them that they may find a defendant guilty of an offense for which there can be no judgment of conviction. The above cases never intended to allow juries to be misled. Indeed, we have suggested that our holding in *Smith* would not apply in a situation where the jury was misled or the defendant prejudiced by remarks indicating what might happen to the defendant if it reached a particular verdict. See *State v. Percy*, 146 Vt. 475, 478–79, 507 A.2d 955, 957–58 (1986) (prosecutor's single, ambiguous remark during closing argument suggesting that defendant would be set free if he were found not guilty by reason of insanity did not entitle defendant to instruction on consequences of verdict of not guilty by reason of insanity).

■ ■ Even in jurisdictions like Vermont, where juries have no formal duties with regard to sentencing, the jury's role cannot be completely separated from punishment. The members of a jury are aware that the function of a criminal trial is to determine culpability

so that those found guilty of the charged crimes can be punished. Although the jury will not know the range of punishment, it expects that, barring legal error, its verdict will stand. *State v. Short*, 618 A.2d 316, 325 (N.J. 1993) (O'Hern, J., dissenting). Thus, allowing a jury to find a defendant guilty of a crime for which the defendant cannot be punished, even if the jury has no say in what the punishment will be, makes a mockery of the trial. To do so is "to trick jurors into thinking that they are discharging one of the most profound responsibilities of a free society when in fact they are not." *Id.* at 326. As one court stated, providing the jury with a choice of offenses, not all of which are viable,

> would amount to a triumph of form over substance and would seriously undermine the credibility of our criminal justice system. Imagine the reaction of a citizen-juror who, after finding a defendant guilty of a lesser related misdemeanor, was informed that the jury's guilty verdict was a nullity and effectively resulted in a complete acquittal. Such sleight of hand cannot be tolerated in a system which strives for openness and honesty.

*People v. Ognibene*, 16 Cal. Rptr. 2d 96, 98 (Ct. App. 1993). But see *State v. Muentner*, 406 N.W.2d 415, 422–23 (Wis. 1987) (*Spaziano's* reasoning that instruction on time-barred, lesser-included offense worked fraud upon jury does not apply in Wisconsin, where jury plays no role in sentencing). In short, to instruct the jury on a time-barred offense precludes the jury from rendering a verdict with legal effect upon which a judgment can be entered, and, consequently, misleads the jury concerning its essential function, thereby undermining the very integrity of the criminal justice system.

■ Further, allowing such an instruction would show unwarranted distrust of juries. The judicial system depends upon jurors to be fair and forthright during deliberations. It assumes that jurors will follow instructions and scrupulously apply the law contained in those instructions to the facts found. Experience has shown that a fully informed jury can be trusted to "discharge its functions appropriately." *Short*, 618 A.2d at 326 (O'Hern, J., dissenting). Ordinarily the combined intelligence, wisdom, and common sense of jurors produces sounder, less biased results than the decisions of a single individual.

We are not convinced, however, that a defendant should be forced to choose between obtaining an instruction on a lesser-included charge and waiving the statute of limitations for that offense. Section 2310 of Title 13 provides only that a person tried for murder "may" be

convicted of a lesser-included offense. Similarly, V.R.Cr.P. 31(c) provides, in part, that "[t]he defendant may be found guilty of an offense necessarily included in the offense charged."

■ We conclude, therefore, that the rights of defendants and the integrity of the system would be best maintained by providing defendants with the choice of (1) foregoing an instruction on the time-barred, lesser-included offense, or (2) obtaining an instruction informing the jurors that, because the passage of time precludes prosecution for the lesser offense, they must acquit the defendant if they conclude that the evidence would support a conviction of the lesser crime only. Cf. *State v. Chevlin*, 284 S.W.2d 563, 567 (Mo. 1955) (approving use of similar instruction). We believe that the latter instruction can be given in a straightforward, understandable manner aided, if necessary, by the use of interrogatories.

We note that a similar instruction was explicitly rejected by a majority of the New Jersey Supreme Court in *State v. Short*, 618 A.2d at 324 (4-3 decision). In that case, the majority concluded that the trial court erred by instructing the jury that it should acquit the defendant upon a finding that his conduct constituted manslaughter because the statute of limitations had run for that offense. *Id.* at 322. The majority opined that by telling the jury that the defendant would go free if it found him guilty of manslaughter, "the trial court all but invited the jury to disregard the manslaughter instruction." *Id.* In the majority's view, in order not to undermine the reasonable doubt standard, the trial court was obliged to give the manslaughter instruction without telling the jury that the statute of limitations had run or that the defendant would go free. *Id.* The majority was unpersuaded by *Spaziano* because "[t]he core of the jury's duty is to determine criminal culpability, not punishment," and the trial court's duty is "to prevent the jury from considering evidence or information that would unduly prejudice either the State or the defense." *Id.* at 323.

■ We find the reasoning of the majority in *Short* unpersuasive for the reasons already stated. We do not agree that instructing jurors on a time-barred offense without telling them it is time-barred is less deceptive in states such as Vermont, where juries do not have a formal role in sentencing, than it is in states where juries do play a role in sentencing. Further, while we agree that the instruction we favor does not eliminate the risk that the jury will convict the defendant of a greater offense than it otherwise would in order to avoid an acquittal, we cannot agree with the majority in *Short* that the

instruction would invite the jury to disregard the manslaughter charge. As the dissent in *Short* points out, courts often rely on juries to follow instructions on other potentially prejudicial matters. *Id.* at 325 (O'Hern, J., dissenting).

Moreover, an instruction on a lesser-included offense serves not only to avoid any incentive to convict the defendant of a greater offense than the one committed, but it also enables the jury to determine fairly the issues presented by the evidence. *Ognibene*, 16 Cal. Rptr. 2d at 97. At a minimum, instructing the jury on the elements of lesser-included offenses, even if they are time-barred, serves to sharpen the definitions of the crimes for which the defendant can be convicted. It enables the jury to put related crimes in the proper perspective by comparing the elements of one to the others.

In sum, we need not require judges to pull "the wool over jurors' eyes" by leading them to believe that "there is a choice of crimes for which to find the defendant guilty, when in reality" there is no choice. *Spaziano*, 468 U.S. at 456; *Short*, 618 A.2d at 324 (O'Hern, J., dissenting). Suspicion that jurors will be unduly swayed by the protection afforded under the statute of limitations, echoed in the concurrence, is unfounded. Jurors are just as capable as other participants in the criminal justice system to understand the policies underpinning the three-year statute of limitations.

Weighing these considerations and the various interests involved, we conclude that a defendant should not be required to waive the statute of limitations of a lesser-included offense as a condition of having the jury instructed on that offense. Neither do we agree, however, with those jurisdictions that require defendants in this situation to forego an instruction on the lesser-included offense, see, e.g., *People v. Diedrich*, 643 P.2d 971, 982, 182 Cal. Rptr. 354, 365 (1982) (trial court not required to instruct on time-barred, lesser-included offense); *Gurley v. State*, 348 N.E.2d 16, 20-21 (Ind. 1976) (same), or that require trial courts to instruct juries on the lesser-included offense without any further explanation. Instead, we hold that defendant should have the option, which was never considered by the Court in *Spaziano*, of receiving an instruction on the lesser-included offense, as long as the jury is made aware that the running of the statute of limitations precludes defendant's conviction for that offense.

The State argues that, even if defendant were entitled to the jury instruction on manslaughter, omission of the instruction was

harmless error because the jury was instructed to acquit defendant of murder if the State proved he killed Laurie Gonyo but failed to meet its burden to prove he did so "willingly and deliberately and with malice aforethought." The State raised this same argument in *State v. Bolio*, 159 Vt. at 254, 617 A.2d at 887, contending that if the State had not sustained its burden on the crime charged, the jury would have acquitted. Our response is still that our acceptance of such an argument "would effectively negate the right to jury instructions on a lesser-included offense in every case. To argue that conviction proves the error was harmless is to miss the reason for the rule . . . ." *Id.*

In this case, the trial court erred in refusing to give defendant's alternative proposed instruction, which would have informed the jury that defendant must be acquitted if found guilty of manslaughter. For that reason, the verdict must be reversed and the case remanded for a new trial. Although we reverse on this point, we address the remaining issues in which defendant seeks acquittal or dismissal of the charges.

## IV.

Defendant next argues that his conviction must be reversed because the trial court improperly denied his post-trial motion for judgment of acquittal. Defendant claims that the State failed to present sufficient evidence of identity, deliberation, or malice for any reasonable jury to have found defendant guilty of second-degree murder beyond a reasonable doubt.

The standard of review for denial of a V.R.Cr.P. 29 motion for judgment of acquittal is whether "the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant[] [is] guilty beyond a reasonable doubt." *State v. McBurney*, 145 Vt. 201, 204, 484 A.2d 926, 928 (1984).

Defendant contends first that the State failed to introduce evidence that fairly and reasonably tended to identify defendant as the victim's killer. The State presented evidence that the knots in the rope binding the victim's body were similar to knots found tied in other ropes associated with defendant. The body was weighted down with cinder blocks painted with black paint in the same pattern as the blocks in the foundation of defendant's mobile home. In addition, the body was wrapped in a black, rubberized tarp, similar to ones used by

defendant in a trucking business. The State also introduced evidence that the victim and defendant were having an affair, and defendant threatened the victim's life the night before she disappeared. Moreover, there was evidence that defendant broke from his normal routine the morning the victim disappeared, and that he went down the road toward the victim's home and returned a short while later for a tarp and other objects from his home. Finally, defendant made inconsistent statements about his whereabouts on the day of the disappearance. While the evidence of identity is entirely circumstantial, "guilt in a criminal case may be proved by circumstantial evidence alone, if it is proper and sufficient in itself." *State v. Messier,* 146 Vt. 145, 150, 499 A.2d 32, 37 (1985). When the evidence is viewed in the light most favorable to the State, it fairly and reasonably tended to show that defendant was the victim's killer. The question was properly put to the jury.

Defendant also argues that the State failed to produce sufficient evidence that if he did kill Laurie Gonyo, he acted with deliberation. Dr. Lawrence Harris, the Chief Medical Examiner at the time the deceased's body was discovered, testified that in his opinion the cause of death was manual strangulation, which must be maintained for at least two or three minutes before death results. Dr. Harris did concede that because of the deteriorated condition of the body, it was possible the victim died from another cause. When viewed in the light most favorable to the State, however, the evidence fairly and reasonably tended to show acts of deliberation.

Defendant further argues that the State failed to produce evidence that whoever killed the deceased acted with the requisite mental state, or ill will, toward her. To prove murder, it is not necessary to prove defendant harbored ill will for the victim. As the trial court instructed the jury, it is sufficient for a second-degree murder conviction that the State prove "'an intention to kill, an intention to do great bodily harm, or a wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm.'" *State v. Johnson,* 158 Vt. at 517–18, 615 A.2d at 137 (quoting *State v. Doucette,* 143 Vt. 573, 582, 470 A.2d 676, 682 (1983)). A defendant's mental state may reasonably be inferred from the manner of death, *id.,* here, manual strangulation for two to three minutes. Because, viewed in the light most favorable to the State, the evidence fairly and reasonably tended to show defendant possessed any one of the enumerated mental states, the trial court properly left the issue to the province of the jury.

## V.

Defendant next asserts that he was prejudiced by the loss of evidence—the tarp and the victim's hyoid bone—and thereby denied his rights under the Fourteenth Amendment to the United States Constitution and Chapter I, Article 10 of the Vermont Constitution. Accordingly, defendant contends, the charges should be dismissed or the evidence suppressed.

The State concedes that it preserved only a small square of the tarp in which the body was wrapped when discovered and that it was unable to produce for trial the fractured hyoid bone. Dr. Harris testified that he preserved the bone in a jar of formaldehyde, but his office had not been able to locate the bone. Defendant speculates that the tangible evidence was lost due to the long delay in prosecution. But the question of *when* the evidence was lost is not the crucial inquiry. The issue is whether the State acted in bad faith and whether defendant was prejudiced. Regardless of when it occurs, the loss of evidence can violate a defendant's constitutional rights.

In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the United States Supreme Court established the federal constitutional standard for proof of denial of due process of law when the State loses or fails to preserve evidence. The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. Defendant argues that the State failed to follow its own procedures for storage of evidence and thereby acted in bad faith in losing the hyoid bone. Though *Youngblood* did not define "bad faith," it is commonly understood to connote that an action was "improperly motivated." *State v. Zaccaro*, 154 Vt. 83, 92, 574 A.2d 1256, 1262 (1990). On the basis of the record, we cannot agree that defendant has met his burden of proving that the State's failure to preserve the hyoid bone was in bad faith.

Disposition of defendant's federal constitutional claim does not necessarily resolve defendant's state constitutional claim. See *State v. Badger*, 141 Vt. 430, 449, 450 A.2d 336, 347 (1982) (noting that we have at times accorded criminal defendants more rights under Vermont Constitution than federal constitution affords). Chapter I, Article 10 of the Vermont Constitution guarantees a criminal defendant the right "to call for evidence in his favor." Defendant argues that this provision requires that the charges be dismissed or the evidence suppressed. He initially raised this state constitutional issue on the

eve of trial. The trial court rejected his motion because it was not adequately briefed. In the interests of judicial economy, we will reach the issue.

■ Prior to *Youngblood*, this Court decided *State v. Bailey*, 144 Vt. 86, 92, 475 A.2d 1045, 1049 (1984), a case in which we interpreted federal due process requirements in instances when the prosecution loses evidence. In *Bailey*, we held that if a defendant shows a reasonable possibility that the lost evidence would be exculpatory, *id.* at 94, 475 A.2d at 1050, then the proper sanctions depend "upon 'a pragmatic balancing' of three factors: (1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial." *Id.* at 95, 475 A.2d at 1050. Factors two and three of the test are both methods to determine the prejudice caused by lost evidence in the context of the entire record.

After the *Youngblood* decision, we ruled in *State v. Seifert*, 151 Vt. 66, 70, 557 A.2d 494, 497 (1989), that *Youngblood* is the controlling federal standard. We believe, however, that *Youngblood* is both too broad and too narrow. It is too broad because it would require the imposition of sanctions even though a defendant has demonstrated no prejudice from the lost evidence. It is too narrow because it limits due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant. Because the *Bailey* test balances the culpability of the government's actions and the prejudice to a defendant, we adopt it as the state constitutional standard.

Defendant argues that *State v. Goshea*, 137 Vt. 69, 398 A.2d 289 (1979), also controls the Article 10 question. In that case, the prosecutor was informed that the alleged victim of a homicide was seen alive, but the prosecutor failed to disclose this to the defense. We found that the failure to disclose the exculpatory evidence violated Article 10. *Id.* at 76–77, 398 A.2d at 294. *Goshea* is inapposite, however, because the evidence in that case was not disclosed, whereas in this case the evidence was lost. When the prosecution fails to disclose exculpatory information, the error can be cured by ordering a new trial. See, e.g., *id.* When evidence is lost, however, the cure may require suppression of testimony based on the lost evidence, or even dismissal of the charges. Moreover, in lost-evidence cases, the lost evidence may be potentially exculpatory only because it has not yet been tested or examined. *Youngblood*, 488 U.S. at 57–58. In short, *Goshea* does not control the standard here.

■ Applying the *Bailey* standard, we cannot say that the loss of the tarp or hyoid bone deprived defendant of his constitutional right to call for evidence in his favor. In regard to the tarp, the first factor, the culpability of the State, is inconclusive. Defendant does not argue that the State's apparent destruction of most of the tarp was done in bad faith. The State speculates on appeal that only a small portion of the tarp was saved because it had a strong unpleasant odor. Regardless, defendant has not shown unfair prejudice. The tarp was important to the State's case in that it helped identify defendant as the victim's killer. Defendant's son, Bud, testified that on the morning of November 4, 1976, defendant hurriedly loaded a black rubberized tarp, like the one in which the victim's body was found wrapped, into his truck. Bud testified that this tarp was splattered with red paint, but the square of tarp preserved by the State neither confirmed nor disproved Bud's description. Defendant argues that if the entire tarp had been saved, it would have allowed him to impeach Bud's testimony. Despite the absence of the entire tarp, however, defendant successfully impeached Bud's testimony on this point. On cross-examination, Bud admitted that the tarp his father loaded into his truck was folded up and he could not "see whether it was covered with red paint," and then admitted that he had misspoken when he had described the tarp. In addition, other evidence served to identify defendant as the victim's killer. That evidence, coupled with defendant's successful impeachment of Bud's testimony, outweigh possible negligence by the State.

In regard to the hyoid bone, the State concedes that it does not know what happened to the bone once it was placed in storage. Although the trial court found that the bone was inadvertently disposed of by the medical examiner's office, defendant has not proven the State acted in bad faith. On the other hand, the bone was important to the State's prosecution. The medical examiner testified that the hyoid bone was fractured and that, based on this fracture, it was his conclusion that the victim died as a result of manual strangulation. Defendant argues that if the bone had been available, he could have had it examined by an expert who might have testified that the condition of the fractured bone was not consistent with manual strangulation. Again, through effective cross-examination, defendant was able to put this theory before the jury. The medical examiner conceded that due to the condition of the body, he could not rule out the possibility that the victim may have died from another cause. Defendant also elicited the medical examiner's admission that

fracture of the hyoid bone is not fatal and that the fracture could have occurred anywhere between zero and ten days before the victim died. Finally, as we have already noted, there was other evidence at trial from which the jury could have adduced defendant's guilt, including self-incriminating statements defendant made to others over the years. After weighing the three *Bailey* factors, we conclude that the loss of the hyoid bone did not result in a denial of defendant's right to call for evidence in his favor.

## VI.

Defendant also argues that he is entitled to judgment of acquittal because he was unfairly prejudiced and thereby denied due process of law by the nearly fourteen-year delay in the indictment. Specifically, defendant asserts that the passage of time resulted in the unavailability of two witnesses—his father and a school bus driver. The State counters that the delay was not willful; rather, it was an investigatory delay caused by a lack of evidence. Once defendant's son came forward with information regarding defendant's activities on the day of the victim's disappearance, the State promptly commenced prosecution. Defendant does not contest the reason for the delay; he alleges only that he was prejudiced by it.

The State of Vermont has no statute of limitations for the prosecution of murder. 13 V.S.A. § 4501(a). The statute of limitations, however, is not the sole measure of whether a prosecution is timely. See *United States v. Marion*, 404 U.S. 307, 325–26 (1971). A defendant may successfully avoid prosecution if the preindictment delay violated defendant's due process rights. *United States v. Lovasco*, 431 U.S. 783, 789–90 (1977). Prosecution will be barred where the delay "violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and which define 'the community's sense of fair play and decency,' *Rochin v. California*, [342 U.S. 165,] 173 [(1952)]." *Id.* at 790. In making this inquiry, courts should consider the reasons for the delay and the actual prejudice to the defendant. *Id.*

Defendant claims he was prejudiced by his inability to have his father testify in person in support of his alibi. Defendant's claim is without merit. The father's inquest testimony was admitted at trial on the ground that it, in defense counsel's words, "specifically relate[d] to the whereabouts of Wayne Delisle." Moreover, while defendant asserts that his father's inquest testimony was not sufficient, and was

not developed for the purpose of giving defendant an alibi, he fails to explain how it might have been different had his father been alive to testify in person. To prove actual prejudice from a time delay during which a witness has died, defendant must demonstrate the exculpatory value of the lost testimony. *United States v. Doerr*, 886 F.2d 944, 964 (7th Cir. 1989). Defendant has failed to do this.

Defendant also claims that he was prejudiced by his inability to develop the testimony of his son's school bus driver, who was deceased at the time of trial. Defendant speculates that the driver's testimony could have rebutted his son's testimony about the events of the morning of November 4, 1976. Because defendant's argument is based on speculation as to the content of the driver's testimony, he has not met his burden. See *id.*

 Defendant has failed to show any actual prejudice attributable to the passage of time. Moreover, the cause of the delay was a lack of evidence sufficient to bring on earlier prosecution. "[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Lovasco*, 431 U.S. at 796.

*Reversed and remanded.*

**Johnson, J.,** concurring. This appeal involves the intersection of two statutory rights accorded to defendants in criminal cases: the right not to be prosecuted for a crime after the statute of limitations has run, and, in a prosecution for murder, the right to have the jury instructed on all lesser-included offenses. I agree with the majority that defendant in this case should not have had to choose between these two rights, but the choice the majority now puts to defendant is no better. In the face of two statutes that may be fully implemented without conflict, the majority has created a collision, and resolved it with a flawed compromise that ultimately negates both rights and forces defendant to essentially the same choice from which the majority purports to save him. Therefore, although I agree defendant's conviction must be reversed, I do not join in part III of the Court's opinion.

## I.

## A.

It has long been the policy of this state that a defendant charged with a homicide is entitled to a jury instruction on the lesser-included

offense of voluntary manslaughter. *State v. Meyer*, 58 Vt. 457, 465, 3 A. 195, 200 (1886); Reporter's Notes, V.R.Cr.P. 31(c); see 13 V.S.A. § 2310. At the same time, the Legislature has determined that prosecutions for voluntary manslaughter are subject to a three-year statute of limitations. 13 V.S.A. § 4501(d). In the present case, the prosecution for murder was undertaken several years after the statute of limitations had run on the lesser-included offense of voluntary manslaughter. Both the trial court and the majority have decided that, under the circumstances presented by this prosecution, a choice between rights must be made.

The trial court concluded that defendant could have the lesser-included-offense instruction, but only if he waived the statute of limitations on the lesser-included crime. The majority overrules this choice in favor of allowing defendant to have the lesser-included-offense instruction, but only if the trial court tells the jury that if they find defendant guilty of the lesser-included offense, he will go free. Otherwise, the majority reasons, the jury will be misled into thinking they may convict on any of the crimes on which they are instructed and expect defendant to be punished, when, in actual fact, a conviction on voluntary manslaughter will result in an acquittal.

In my view, the majority's compromise vitiates both rights, and does so in circumstances where no compromise is necessary. The purpose of giving a lesser-included-offense instruction is to give defendant the full benefit of the reasonable doubt standard. *Beck v. Alabama*, 447 U.S. 625, 634 (1980). It is based on the concern that "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction." *Keeble v. United States*, 412 U.S. 205, 212–13 (1973). As the majority recognizes, giving the lesser-included-offense instruction ensures that the jury will "avoid any incentive to convict the defendant of a greater offense than the one committed." This underlying purpose does not change when the statute of limitations runs on one of the lesser-included offenses. Thus, if the court tells the jury it must consider the lesser-included offense, but a jury verdict of guilty of that offense will result in his acquittal, the court has effectively eliminated the rationale for giving the instruction in the first place. It may even have invited a conviction on a greater offense than the one committed, exactly the opposite of the result intended by the instruction. See *State v. Short*, 618 A.2d 316, 322 (N.J. 1993) (telling jury that defendant would go free if convicted of lesser-included offense of manslaughter all but invited

jury to disregard manslaughter instruction). If defendant chooses not to run this risk, he is forced to forego his right to a lesser-included-offense instruction, and the effect of the statute of limitations becomes moot. Defendant then finds himself in essentially the same position he was in originally.

To implement its scheme, however, the Court has to impliedly hold that defendant's right to the statute of limitations may be waived. On the contrary, in Vermont, the statute of limitations is not simply an affirmative defense that defendant may waive if he chooses. Section 4503 of Title 13 provides that prosecutions for felonies and misdemeanors commenced after the statute of limitations has run "shall be void." See *In re Mullestein*, 148 Vt. 170, 173–74, 531 A.2d 890, 892–93 (1987) (where Legislature provides time limit for action and consequence for failure to meet it, statutory language is mandatory). As we held recently, "once the statute of limitations in effect at the time of the alleged offense runs out . . . a criminal, by grace of the legislature, is granted a right to be free of prosecution . . . ." *State v. Petrucelli*, 156 Vt. 382, 384, 592 A.2d 365, 366 (1991).

Various policy considerations underlie a criminal statute of limitations. It protects potential defendants from having to defend against charges when the passage of time has obscured basic facts, it encourages law enforcement officials to investigate possible wrongdoing promptly, and it creates a fixed time period following the occurrence of the punishable act in which a person is exposed to criminal prosecution through the power of the state. *State v. Burns*, 151 Vt. 621, 623 n.3, 564 A.2d 593, 594 n.3 (1989). But today's decision defeats all of these policies, for it provides an avenue by which prosecutors may avoid the statute of limitations on all lesser-included offenses when there is no time limitation, or a greater one, on prosecution for the greater offense. See 13 V.S.A. § 4501 (setting forth limitation periods for crimes).

## B.

Not only do policy considerations argue against the majority's approach, the application of ordinary rules of statutory construction likewise compels a different result. It is readily apparent that the right to a lesser-included-offense instruction and the right to assert the statute of limitations can be accommodated by a straightforward application of both statutes. The jury may be instructed as to all lesser-included offenses within the charged offense, without mention of whether a lesser-included offense is time-barred. If the jury finds

defendant guilty of a time-barred offense, the trial court must acquit, as the Legislature has decreed that no punishment may be imposed for that offense.

There is no conflict in the express provisions of the statutes involved here such that the Court is obliged to harmonize their application in the circumstances of this case. There is no language in the lesser-included-offense statute to suggest it should not be given if the offense is time-barred, and there is no language in the limitations statute that remotely suggests it does not operate when applied to a lesser-included offense. Unless and until the Legislature changes the operation of these statutes as applied to the circumstances now before the Court, we are bound to apply them as written. See *State v. Wilcox*, 160 Vt. 271, 275, 628 A.2d 924, 926 (1993) (where meaning of statute is plain on its face, statute must be enforced according to its express terms).

## II.

The majority's rationale for the creation of its special rule on time-barred lesser-included offenses is based on the policy grounds set forth in the United States Supreme Court's decision in *Spaziano v. Florida*, 468 U.S. 447 (1984). The Court held, in factual circumstances similar to this case, that the due process clause does not require that a lesser-included-offense instruction be given if the lesser-included crime is time-barred. *Id.* at 455. It reasoned that giving such an instruction distorts the fact-finding process because the jury is "tricked into believing that it has a choice of crimes for which to find defendant guilty, [when] in reality there is no choice." *Id.* at 456. But see *Short*, 618 A.2d at 323–24 (rejecting *Spaziano* and holding that defendant is entitled to instruction on all lesser-included offenses, even if time-barred, and without mention of consequences); *State v. Muentner*, 406 N.W.2d 415, 421, 422–23 (Wis. 1987) (same).

Whether or not one agrees with the proposition that these rights are not constitutionally compelled, *Spaziano* is inapposite to this case because the right to an instruction on lesser-included offenses in Vermont derives from statute, rule, and common law, not the due process clause. Moreover, essential to the *Spaziano* analysis is the assumption that the statute of limitations on crimes is waivable as a matter of state law, 468 U.S. at 454–57, whereas in Vermont, such is not the case.

To the question of whether the straightforward implementation of Vermont law works a fraud upon the jury, the answer is clearly no,

when reviewed in light of the historical role of the jury in Vermont. We have long held that a criminal jury determines only guilt or innocence, a determination made independently of punishment concerns. In *State v. Lapan*, 101 Vt. 124, 142, 141 A. 686, 695 (1928), we held that a trial court properly refused a jury's request to be informed of the penalty of the lesser-included offense of manslaughter. "Inasmuch as the court alone was to fix the penalty within the terms of the statute, the jury were correctly instructed that they had nothing to do with the penalty and that it should not enter into their consideration or discussion." *Id.* at 142–43, 141 A. at 695 (citation omitted); see also *State v. Smith*, 136 Vt. 520, 526, 396 A.2d 126, 129 (1978) ("disposition after verdict is for the court, and is not to be charged to the jury"); *State v. Goyet*, 120 Vt. 12, 52, 132 A.2d 623, 649 (1957) (punishment is not jury's consideration; jury should consider only facts in determining whether defendant committed first- or second-degree murder).*

Thus, the jury's sole function is to determine which crime, if any, was committed, a determination that must be based on an analysis of the elements of each crime and the evidence presented. Whether or not the statute of limitations has run on one of the lesser-included offenses has no bearing on this question. But if the jury is told that defendant will go unpunished if convicted of the lesser-included offense, the focus of the fact-finding process would probably shift from a consideration of which crime defendant may have committed to the crimes for which defendant may actually be punished. Giving the jury information that is irrelevant to a determination of guilt or innocence, yet gives the jury the power to punish, distorts the fact-finding process more than withholding information on the statute of limitations. As the New Jersey Supreme Court stated in *Short*:

> The trial court's task is to let the jurors know what they need to know in order to make a fair decision on criminal liability in accordance with applicable law, not to give them whatever information they might want in order to assure the imposition of

---

* The majority does not expressly overrule these cases; it merely sweeps aside fifty years of precedent by stating that the rules set forth therein "would not apply in a situation where the jury was misled or the defendant prejudiced by remarks indicating what might happen to the defendant if it reached a particular verdict." The majority cites *State v. Percy*, 146 Vt. 475, 507 A.2d 955 (1986), for support. The only proposition for which *Percy* stands is that a curative instruction must be given to the jury if an attorney affirmatively misinforms the jury as to disposition after sentence and the defendant is thereby prejudiced. *Id.* at 479, 507 A.2d at 957.

criminal punishment. . . . [T]he successful completion of that task by a trial court constitutes neither "trickery" nor "deception" but a job well done.

618 A.2d at 324.

The majority also reasons that withholding information on the statute of limitations implies a distrust of the jury's ability to follow instructions. Our system of justice relies on the presumption that juries will follow instructions, but "we have recognized that in some circumstances 'the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'" *Simmons v. South Carolina,* — U.S. —, —, 114 S. Ct. 2187, 2197 (1994) (plurality) (quoting *Bruton v. United States,* 391 U.S. 123, 135 (1968)). Thus, to ensure a fair trial, courts often keep relevant evidence and other information from juries. See, e.g., V.R.E. 403 (permitting trial court to exclude relevant evidence if prejudicial effect outweighs probative value); *Herald Ass'n v. Ellison,* 138 Vt. 529, 542–43, 419 A.2d 323, 331 (1980) (Hill, J., concurring and dissenting) (discussing protective measures available to trial judge to prevent undue influence on jury, including sequestration).

I freely acknowledge that the jury would probably be displeased to learn that defendant, convicted of the time-barred offense of voluntary manslaughter, would go unpunished for the crime. But I also suspect that the original jury that convicted defendant may not agree with this Court that defendant's conviction should be overturned on a point of law. The rules governing criminal trials are not designed to ensure the jury's happiness with its role in the judicial process. Nor are juries convened to ensure that defendants will be punished. Rather, the rules are designed to determine what offense a defendant has committed, based on the evidence, by a "tribunal free of prejudice, passion, excitement, and tyrannical power." *Chambers v. Florida,* 309 U.S. 227, 237 (1940). To be sure, a result that diminishes a jury's sense of purpose is, all else being equal, an undesirable one. But all else is not equal in this case. In the long run, we best ensure public confidence in the integrity of the judicial system by adhering to fair rules of procedure applied even-handedly to all defendants. In this case, I believe that the scheme adopted by the majority departs from that course, and I therefore respectfully dissent from the Court's instruction on remand.

Justice Dooley joins in this concurrence.