Associate Chief Justice Lee,
concurring in part and concurring the judgment:
¶ 56 In this case, as in State v. Tiedemann, 2007 UT 49, ¶ 44, 162 P.3d 1106, the court holds that the State has an obligation to preserve evidence that is reasonably likely to affect the outcome of trial. Further echoing Tiedemann, the majority next concludes that the decision on an appropriate remedy for a violation of the duty of preservation depends on a “balance” of two factors—“the culpability of the state and the prejudice to the defendant.” Supra ¶27. And finally, applying these standards, the court concludes that the State’s failure to preserve the evidence in question in this ease justifies dismissal of the charges against Ms. DeJesus.
¶ 57 I agree with all of these premises and conclusions. Thé State has a duty to preserve evidence in its possession that is of known materiality to a criminal case. And the destruction of the video recording at issue here is sufficiently troubling that I support the decision to dismiss the charges in this case.
¶ 58 That said, I write separately because I would identify a different basis from the majority for the State’s duty of preservation and for the court’s power to impose a sanction for a violation of that duty. Unlike the majority, I would not root these principles in the Due Process Clause of the Utah Constitution. I would base them on our inherent power to regulate proceedings in our courts—as reflected in our rules of criminal procedure (specifically, rule 16)., Thus, I would defer to and leave unaltered the standards set forth in Tiedemann. But because those standards are easily sustained without reference to the Due Process Clause, I would exercise the restraint counseled by the doctrine of constitutional avoidance. I would hold that the duty and standards set forth in Tiedemann are a matter of inherent judicial power and enforcement of the terms of rule 16 of our rules of criminal procedure. And I would reverse on that basis, without concluding'(one way or another) that the Tiedemann principles are required as a matter of constitutional law.[72]
¶ 59 The adjustment I propose is a modest one on the surface. But it has both practical and theoretical significance.' If we mean to retain the power to refine and adjust the standard set forth in Tiedemann (as the majority suggests, see supra ¶¶21-29), we should avoid rooting that standard in constitutional soil. We should base it instead on our inherent power to regulate practice and procedure in our courts, under rule 16 or otherwise.
I
¶ 60 For at least a couple of centuries, the courts have adverted to the existence of “[cjertain implied powers” that “necessarily result to our Courts of justice from the nature of their institution.” United States v. Hudson, 11 U.S. (7 Crunch) 32, 34, 3 L.Ed. 259 (1812). Such powers include those the courts deem necessary “to preserve [their] own existence and promote the end and object of [their] creation.” Id. at 33. To that end, the courts have long asserted the authority to impose contempt sanctions in an effort to enforce “the observance of order.” Id. at 34. As a close cousin to the contempt power, the courts have also long maintained the power to sanction a party for destroying evidence of relevance to the disposition of a case.[73]
*128 ¶ 61 This power is sometimes framed as a matter of the common law. The common law doctrine of relevance to the destruction of material evidence is called spoliation.[74] There is a split in the courts on whether to recognize a common-law claim for damages for spoliation,[75] But most courts have recognized some form of common-law or inherent power-based doctrine that allows for the imposition of sanctions against a party who destroys or fails to preserve evidence in litigation.[76] And, recognizing that not all acts of spoliation have the same impact, the common law has carved out room for different remedies—ranging from a judgment against the infringing party to a mere instruction permitting the jury to draw an adverse infer-enee that the missing evidence would have harmed that party’s case.[77]
¶ 62 Our courts have also formulated rules of procedure to regulate’ the practice in this area. Rule 16 of the federal rules of criminal procedure requires the government to disclose or permit the defendant to inspect and copy evidence in its “possession, custody, or control” that it intends to introduce at trial or that is material to the preparation of the defense of a ease. Fed. R. Crim. P. 16. Covered evidence includes “photograph books, papers, documents, data, photographs, tangible objects, [and] buildings or places.” Id. 16(a)(1)(E). In light of the duty to disclose, the federal courts have held that the government bears a duty to preserve discoverable evidence.[78] And when that duty is breached, *129 the federal courts have exercised their discretion under the rules to impose a sanction—to enter “any ... order that is just under the circumstances.” Id. 16(d)(2)(D). The sanction orders imposed for failure to preserve have included an adverse inference instruction[79] and dismissal of criminal charges.[80] In deciding on the appropriate sanction, moreover, the courts have articulated a number of factors to be considered. Those factors include the reasons for the government’s nondisclosure, the extent of the prejudice to the defense, and the feasibility of rectifying the prejudice through a continuance or otherwise.[81]
¶ 63 Our Utah rule is a general parallel of the federal provision. Like the federal rule, our criminal rule 16 requires the government to “disclose to the defense” certain information in its possession. Utah R. Crim. P. 16(a). Under the Utah rule, the information to be disclosed includes “evidence which the court determines on good cause shown should be made available to the defendant in order for the defendant to adequately prepare his defense.” Id. 16(a)(5). And our rule also recognizes the authority of the court to enter sanctions for any failure “to comply with this rule.” Id. 16(g). Like the federal rule, our rule spells out specific sanctions that may be entered, but also states that the court “may enter such other order as it deems just under the circumstances.” Id. 16(g).
II
¶ 64 The Tiedemann case was decided against the above backdrop. Mr. Tledemann’s case came before us on an interlocutory appeal. Tiedemann stood charged with aggravated murder, aggravated kidnapping, and aggravated sexual assault. He was initially declared incompetent to stand trial. 2007 UT 49, ¶ 7, 162 P.3d 1106. And the charges against him were dismissed after he was subjected to civil commitment. Id. At that point Tiedemann was deemed “unlikely to ever be found competent to stand trial.” Id. And “the state evidence custodian notified the investigating officer that physical evidence from the case would be destroyed unless an objection was filed within thirty days.” Id. ¶ 8. Absent any objection, certain physical evidence was destroyed. When Tied-emann was released from the state hospital many years later, the State refiled charges against him. Tiedemann, now deemed competent to stand trial, moved “to dismiss the case due to destruction of evidence.” Id. ¶ 10.
¶ 65 The district court denied Tiedemann’s motion, and this court agreed to consider that decision on interlocutory appeal. Id. In challenging the denial of the motion to dismiss, Tiedemann asserted a federal due process argument. Citing Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), Tiedemann argued that his right to due process was infringed because “the evidence may have been exculpatory, no comparable evidence still exists, and the destruction was done in bad faith.” Tiedemann, 2007 UT 49, ¶ 30, 162 P.3d 1106. But Tiedemann also asserted alternative grounds for his mo *130 tion to dismiss. He cited rule 16 of our rules of criminal procedure[82] as well as the Due Process Clause of the Utah Constitution. And he urged the court to dismiss the charges against him even if it did not find the “bad faith” required as a matter of federal due process under Youngblood, 488 U.S. at 58, 109 S.Ct. 333.[83]
¶ 66 The Tiedemann majority found a lack of “any degree of culpability or bad faith on the part of the State.” 2007 UT 49, ¶ 46, 162 P.3d 1106. So it rejected Tiedemann’s federal due process claim. But the court accepted his invitation to establish a standard that could protect a defendant even absent such a showing. In articulating such a standard, the Tiedemann court cited rule 16 of our criminal rules, noting that this rule “imposes broad obligations on prosecutors to produce” evidence material to a defense “or make it available to a defendant.” Id. ¶ 40. Citing prior cases interpreting this rule, Tiedemann held that “‘[t]he prosecutor’s good faith should not have ... any impact on the trial court’s determination of whether the prosecutor had violated his discovery duties.’” Id. (quoting State v. Knight, 734 P.2d 913, 918 n.5 (Utah 1987)). And, in further reliance on our rule 16 precedents, the Tiedemann majority listed factors of relevance to the determination whether the State is in violation of its duties under the rule, including “the culpability of the prosecutor” and the impact of the violation on the defense (or likely “prejudice” to the outcome). Id. ¶ 41 (quoting State v. Kallin, 877 P.2d 138, 143 (Utah 1994)).
¶ 67 The holding in Tiedemann was expressly tied to some degree to rule 16. The majority stated that “[o]ur approach under rule 16 should govern the destruction of evidence,” holding that “the culpability or bad faith of the state should be only one consideration, not a bright line test.” Id. Elsewhere, the Tiedemann court also attributed its standard to the Due Process Clause of our Utah Constitution. Id. ¶ 44 (citing Utah Const. art. I, § 7). But the authorities it cited were tied to a large extent to standards like that set forth in our criminal rule 16.[84] Even the Vermont case from which Tiedemann drew its standard, State v. Delisle, 162 Vt. 293, 648 A.2d 632 (1994), is along these lines. The Delisle decision is admittedly based on the Vermont Constitution. But the holding in Delisle is ultimately based not on a general right to due process but on that state constitution’s guarantee of a right of a criminal defendant “‘to call for evidence in his favor.’” See Delisle, 648 A.2d at 642 (quoting Vt. Const. ch. 1, art. 10). In light of that right, the Delisle court found a duty of the government to preserve evidence, and held that dismissal may be appropriate depending on the importance of the evidence in question and the strength of other evidence of guilt. Id. at 642-43.
¶ 68 I would interpret Tiedemann as resting on our inherent power to regulate practice and procedure in criminal litigation in our courts as reflected in our criminal rule 16 and the extensive authorities cited above. In so doing, I would acknowledge the fact that Tiedemann purported to state a requirement of state due process. And I would leave open the possibility that our Utah Due Process Clause may have a role to play in establishing a “floor” or minimum standard protecting an accused whose defense is interfered with by the destruction of material evidence. But I would not “double down” on the constitutional basis for the standard we have articulated in this area. Instead, in the spirit of constitutional avoidance, and in light of the settled, alternative grounds for our authority in this area, I would root the Tiedemann standards in our inherent power and rulemaking power under criminal rule 16.
*131 hi
¶ 69 The proposed reformation of Tiedemann is a simple one. I would not alter any of the standards set forth in that opinion. T would simply recast the legal basis for our holding, tying it to our inherent power as reflected in rule 16. To do so, we need to say only what the federal courts have long said under the counterpart federal rule—that the government’s duty to disclose material evidence encompasses a duty to preserve such evidence. See supra ¶ 62. Tiedemann, as noted above, effectively did that. I would make that more explicit here. And I would state this as the basis (going forward) for the standards that we have articulated in this area.
¶70 This adjustment is subtle. But it is hardly without consequence. The doctrine of constitutional avoidance wisely counsels against resolving cases on constitutional grounds when a non-constitutional ground is available. See Nevares v. M.L.S., 2015 UT 34, ¶¶ 38-39, 345 P.3d 719. For good reasons. Our constitutional decisions are set in relative stone: They place matters resolved by them beyond the policy reach of this or other branches of government, and they establish precedent that we ourselves may be bound by under the doctrine mf stare decisis. For these and other sound reasons, our courts have long deemed constitutional grounds a matter of last resort.
¶ 71' Our cases have stated this principle in the specific context of the Due Process Clause. We have warned of the perils of treating this provision as a “free-wheeling constitutional license for courts to assure fairness on a case-by-case basis.” In re Discipline of Steffensen, 2016 UT 18, ¶ 7, 373 P.3d 186. We have indicated that “[w]e retain discretionary license to assure fair procedure in the cases that proceed through'our justice system.” M But we have explained that “our usual course for doing so is by promulgating rules of procedure.” Id.; see also Ownbey v. Morgan, 256 U.S. 94, 110-11, 41 S.Ct. 433, 65 L.Ed. 837 (1921) (“The due process clause does not impose upon the states a- duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible «hardship that may befall.”).
¶ 72 This is a sound, practical reason for reformulating the theoretical basis for the framework set forth in Tiedemann,[85] By relocating the Tiedemann standard to rule 16 and oúr inherent power, we avoid the entrenchment inherent in a constitutional decision. And instead we tap into the process we have put in place for the promulgation and amendment of the rules governing practice and procedure in our courts.
¶ 73 That seemingly minor adjustment is a significant one. Our rules process is set up in a manner that facilitates both ready decision-making and wide-ranging input from the bar. Through our advisory committees and public comment process, we receive input on proposed amendments from a wide range of interested ■ parties. And through the rules process, we can make ready adjustments to our rules on the fly—as soon as we are convinced of the need to make a change.
¶74 None of this holds in the context of the decisions we make in the exercise of our appellate jurisdiction. When we exercise that power we maintain a passive posture. We maintain neither “FORCE nor WILL, but merely judgment.” The Federalist No. 78 (Alexander Hamilton). We “can take no active resolution whatever,” id. in that we do not set our own agenda, but must await a judicial case that presents a live, disputed issue before we have the authority to tackle it. That is, as it should be in the exercise of our appellate jurisdiction. When we endeavor to set rules to assure fair procedure in our courts, however, we need greater flexibility.
*132 ¶ 75 This case illustrates the point. Because the “touchstone” of the Tiedemann standard is “fundamental fairness,” the court goes out of its way to emphasize that the standards we set forth in that case are not the be-all-end-all of the matter. Supra ¶46 n.67. It notes, in particular, that we may'yet find new “less drastic” remedies than the one identified in Tiedemann. Id. And presumably the court is opening the door to the possibility of further adjustments to the Tiedemann standard on other points. I assume that’s the point of reiterating a “touchstone” as broad as “fundamental fairness.”
¶ 76 I’m all for fundamental fairness. But if that is our goal, we should root our power in a ground that is better suited to vindicating it. When we make rules of practice and procedure we need to be able to set our own agenda. We need the flexibility to make adjustments to our law as we see fit and as new policies and procedures come to our attention. Yet that highlights a defect in the majority’s approach. The constitution is not a charter for the promulgation of ever-evolving standards of practice. Its premise is the opposite—of the need for the establishment of “certain limits not to be transcended” and “designed to be permanent.” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803).
¶ 77 We distort the constitution when we press it into the sort of service for which our rules process is designed. I would avoid that distortion here. I would do so through the doctrine of constitutional avoidance—by re-conceptualizing the legal foundation of Tiedemann while still retaining its doctrinal elements.
IV
¶78 I see no barrier to my approach in any of the majority’s objections. First, there is nothing “novel” about resolving a ease on non-constitutional grounds when a constitutional decision is unnecessary. See supra ¶33 (criticizing my approach as somehow “novel”). And that is all that I am proposing. My point is not that “we should avoid procedural due process questions ‘properly presented by the record’ because we have inherent authority to malee rules of 'procedure.” Supra ¶33 (emphasis added), It is that we already have an applicable rule of procedure (rule 16) that can stand as a basis for our articulation of standards regulating the spoliation of evidence by the prosecution. Because Tiede-mann can be understood to be rooted in our interpretation of rule 16 (and the exercise of the inherent power i’ecognized in that rule), we need not conclude that the Due Process Clause requires the standards we articulated in Tiedemann.
¶ 79 I recognize that the Tiedemann opinion purported to “plant[ ]” its “test in constitutional soil.” Supra ¶32. But it also cited rule 16, as have the courts in other jurisdictions that have adopted similar tests. And that fact renders this a straightforward application of the doctrine of constitutional avoidance: Because we have a rule of procedure that regulates spoliation of evidence and reflects our inherent power in this field, we can easily deem the standards set forth in Tiedemann a reflection of our inherent power in this field—without deciding whether the Due Process Clause demands the same standard. Thus, we can construe Tiedemann as declaring that this court has satisfied the Due Process Clause by promulgating rale 16. We need not deem Tiedemann to establish the rule 16 standard as the constitutional floor under the Due Process Clause.
¶ 80 Second, the court is wrong to insist that my approach only avoids “certain constitutional issues” while giving rise to other “new constitutional issues,” such as those implicated in a constitutional challenge to the application of rule 16. Supra ¶33 n.48. The tradeoff identified by the majority is illusory. At most, the court is observing that my approach leaves open the possibility that a court’s application of a standard rooted in rule 16 “could be subject to constitutional challenge.” Supra ¶33 n.48. Yet the majority’s approach makes constitutional analysis not just possible but required; if the Tiedemann standard is rooted in due process, then a court is engaged in constitutional decision-making in every case in which there is an allegation of prosecutorial spoliation of evidence.
*133 ¶ 81 It is no answer to assert that a rules-based approach “would be a poor substitute for the protections, including more robust appellate review, that our interpretation of the due process clause affords criminal defendants,” [86] or that a due process conception of Tiedemann is necessary to preserve “this court’s previous conclusion that government loss or destruction of exculpatory evidence directly implicates due process.” Supra ¶35. The majority’s critiques along these lines are circular. They assume that the Tiedemann standard is in fact required by the terms of the Due Process Clause. That is the question that I would avoid here. I see nothing in the Tiedemann opinion that supports the conclusion that the constitutional guarantee of “due process of law” was understood at the time of the framing of the constitution to guarantee the standards announced in that opinion. Tiedemann, in fact, professed a prerogative of making state constitutional law on the basis of “sister state law” and “policy arguments.” 2007 UT 49, ¶ 37, 162 P.3d 1106. And it repudiated the originalist approach to constitutional interpretation announced in some of this court’s decisions. See id. (noting the originalist approach to constitutional interpretation but deeming it only “persuasive in some cases” and not required). Those are reasons alone to question the constitutional foundation of the Tiedemann standard. Yet we need not reach that issue here. We can decide this ease by recognizing only a non-constitutional basis for the Tiedemann approach.
¶ 82 Neither Tiedemann nor the briefing presented in this case tells us anything of relevance to whether the standard we apply today is a “suitable floor concerning the destruction of evidence.” Supra ¶32 n.45. That question, in my view, turns entirely on material not yet examined by this court—on whether the guarantee of “due process of law” would have been understood in 1896 to encompass the protections we recognized in Tiedemann. The majority offers no historical or textual support for its conclusion, and without it I cannot see how the court can insist that Tiedemann is a “suitable floor,” much less that it is the protection guaranteed by the founders of this state. I would reserve that analysis for a different case in which we have briefing and argument of relevance to this inquiry. And I would conclude that Tiedemann simply dictates that rule 16 does not fall below the floor of the Due Process Clause, whatever that floor may ultimately be.

. My point is mostly theoretical: I would retain each of the legal standards set forth in Tiede-mann and reinforced again today, and alter only the theoretical basis for those standards. But theory matters. It matters most, perhaps, when it comes to our power of judicial review under the constitution. A judicial declaration of a constitu-tidnal requirement is a matter of grave significance. When we exercise that power, we remove the matter from' further adjustment or amendment at the policymaking level. That is a significant step. We should not take it lightly.

. See Bart S. Wilhoit, Comment, Spoliation of Evidence: The Viability of Four Emerging Torts, *128 46 UCLA L. Rev. 631, 637-38 (1998) ("Although the common law did not recognize an independent action in tort, common-law courts allowed juries to infer that destroyed evidence would have worked against the spoliating party. Beginning with Armory v. Delamirie, 93 Eng. Rep. 664 (K.B. 1772) in 1772, courts began to establish legal precedent to remedy the destruction of evidence.”); Jonathan Judge, Reconsidering Spoliation: Common-Sense Alternatives to the Spoliation Tort, 2001 Wis. L. Rev. 441, 446-47 ("Courts have tried to fill these gaps [of sanctioning spoliation] by relying on the 'inherent powers' of the court— powers needed for the exercise of all others. Since the court must structure its proceedings for the most effective ascertainment of the truth, it arguably can punish spoliation of any sort that the court believes is intended to hinder its work.” (footnotes omitted)); 61A Am. Jur. 2d Pleading § 601 ("[T]he federal courts possess the inherent power to manage their own affairs to achieve the orderly and expeditious disposition of cases. This .includes the inherent power to impose reasonable and appropriate sanctions for conduct which abuses the judicial process, since the court possesses the power to punish for contempt, as well as the power to control admission to its bar, discipline attorneys who appear before it, dismiss a lawsuit or enter a default judgment, impose fines, and assess attorney’s fees.” (footnotes omitted)).

. The term looks like a typo—a mistaken attempt to speak of spoliation. But the term spoliation has deep roots in the common law. See supra ¶60, n.73. And it is traced etymologically to the Latin spoliationem, meaning "a robbing, plundering, pillaging.” Spoliation, Online Etymology Dictionary, http://www.etymonline.com/index. php?allowed_in_frame=0&search=spoliation (last visited Mar. 27, 2017).

. See generally Intentional Spoliation of Evidence, Interfering with Prospective Civil Action, As Actionable, 70 A.L.R.4th 984 (1989) (noting that some states do not recognize spoliation as a common law tort, while setting forth the elements of the tort in other states).

. See, e.g., In re Evans, 42 Utah 282, 130 P. 217, 224 (1913) ("It is undoubtedly true that courts of general and superior jurisdiction possess certain inherent powers not derived from any statute. Among these are the power to punish for contempt, to make, modify, and enforce rules for the regulation of the business before the court.... Such inherent powers of courts are necessary to the proper discharge of their duties.”); Restaurant Mgmt. Co. v. Kidde-Fenwal, Inc., 127 N.M. 708, 986 P.2d 504, 507-08 (N.M. Ct. App. 1999) ("A remedy for the destruction of evidence may be available pursuant to the inherent power of the courts 'to impose sanctions on both litigants and attorneys in order to regulate their docket[s], promote judicial efficiency, and deter frivolous claims.' ... The rationale underlying the existence of the inherent power of the courts is that 'a court must be able to command the obedience of litigants and their attorneys if it is to perform its judicial functions.'" (alteration in original) (citations omitted)).

. See, e.g., Fines v. Ressler Enters., Inc., 820 N.W.2d 688, 694 (N.D. 2012) (affirming the district court’s dismissal of a case where the plaintiff was found to have destroyed evidence); Stender v. Vincent, 92 Hawai’i 355, 992 P.2d 50, 60 (2000) (holding that it was not an abuse of discretion for a trial court to give an "adverse inference instruction” against a party that destroyed evidence).

. See 3C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE 189 (2008) (citing Advisory Committee Notes to Federal Rules of Criminal Procedure).

. See Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) ("In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed.”); People v. Kelly, 62 N.Y.2d 516, 478 N.Y.S.2d 834, 467 N.E.2d 498, 501 (1984) (applying New York rule, which parallels federal rule; concluding that dismissal was an abuse of discretion where adverse inference instruction would have adequately remedied prejudice caused by government’s destruction of evidence).

. See United States v. Zaragoza-Moreira, 780 F.3d 971, 982 (9th Cir. 2015) (directing the district court on remand to dismiss the indictment against the defendant because the government had the duty to preserve evidence but failed to do so); People v. Howard, 122 Misc.2d 26, 469 N.Y.S.2d 871, 874 (Crim. Ct. 1983) (applying New York rule; concluding that sanction of dismissal was appropriate).

. See, e.g., Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc., No. 97-5089, 1998 WL 68879, at *4 (10th Cir. Feb. 20, 1998) ("When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence, and (2) the degree of actual prejudice to the other party.”); Flury v. Daimler Chrysler Corp., 427 F.3d 939, 946 (11th Cir. 2005) (considering culpability of the spoliator and prejudice to the opposing party in assessing whether dismissal is warranted or an adverse inference instruction is appropriate).

. Brief for Tiedemann at 50, State v. Tiedemann, 2007 UT 49, 162 P.3d 1106 (arguing that the prosecution has a duty to preserve evidence and that the evidence in this case "would have been discoverable under Utah law” under rule 16 of the Utah Rules of Criminal Procedure).

. Brief for Tiedemann at 46-47 (requesting that the court "not now require ... a showing [of bad faith] under a due process analysis for the state constitution," and urging the court to instead consider other factors, including "the degree of prejudice to the defendant").

.See Thorne v. Dep't of Pub. Safety, 774 P.2d 1326, 1330 & n.8 (Alaska 1989); Hammond v. State, 569 A.2d 81, 88 (Del. 1989); State v, Matafeo, 71 Haw. 183, 787 P.2d 671, 673 (1990); State v. Osakalumi, 194 W.Va. 758, 461 S.E.2d 504, 511 n.10 (1995).

. We could identify additional reasons—in the premises for the interpretive methodology of originalism, for example. In re K.A.S., 2016 UT 55, ¶ 46, 390 P.3d 278 (Lee, J., dissenting) (advo-eating an originalist basis for our interpretation of the Utah Due Process Clause—a “historically driven test 'measured by reference to "traditional notions of fair play and substantial justice” ’ ”— while noting that our "usual course” for assuring "fair procedure” is to promulgate "rules of procedure”). But we need not do, so to- decide this case. We can save for another day the question whether there may also be a constitutional basis for the standards in Tiedemann—a minimum constitutional guarantee in this area. I would take that approach here, , • .

. I have no problem with the court's aspiration for more robust appellate review in cases involving allegations of prosecutorial spoliation of evidence. See supra ¶35. But we can achieve that outcome without attributing our preferences to the dictates of the Utah Constitution. We can provide for more searching appellate review by rule. And on this and all points of policy, I far prefer the rulemaking route to a decision to open the door to "reinterpreting” the constitution each time we wish to add to the protections prescribed in prior cases.